June VALANZUELA, Plaintiff,

v.

James H. SNIDER, a/k/a Buster Snider; Officer Harry Queen; former Chief of Police, Thomas Coogan, in his individual capacity only; Chief of Police Aristedes Zavaras, in his official capacity only; Mayor Federico Pena; and the City and County of Denver, Defendants.

Civ. A. No. 85–K–1845.

United States District Court,
D. Colorado.

June 20, 1995.

Kenneth A. Padilla, Kathy P. Bonham, Denver, CO, for plaintiff.

Robert M. Liechty, Theodore S. Halaby, Denver, CO, for all defendants except Snider.

David Bruno, Denver, CO, co-counsel, for defendant Queen.

Lee Rallis, Denver, CO, for defendant Snider.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

June Valanzuela filed this civil rights case arising out of an alleged kidnapping, false imprisonment and repeated sexual assaults by then police officer James H. Snider, a/k/a Buster Snider. Plaintiff filed her complaint in the District Court for the City and County of Denver in July 1985. Defendants removed the action to this court.

The Second Amended Complaint asserts claims under 42 U.S.C. §§ 1983 and 1985 and nine pendent state tort claims against Snider, Officer Harry H. Queen, former Chief of Police, Thomas Coogan (in his individual capacity), Chief of Police Aristedes Zavaras (in his official capacity), Manager of Safety Manuel Martinez (in his official capacity), Mayor Federico Pena, and the City and County of Denver ("City").[1]

Before me is a motion for summary judgment filed by all Defendants with the exception of Snider. In their motion, Defendants argue they are entitled to judgment as a matter of law on the following grounds: (1) Coogan and Queen have qualified immunity from the ninth and tenth claims for relief under 42 U.S.C. §§ 1983 and 1985; (2) Plain-

---

1. In December 1988, Thomas Coogan, Chief of Police and J.D. MacFarlane, Manager of Safety of the City and County of Denver, two of the originally named Defendants, moved pursuant to Federal Rule of Civil Procedure 25(d)(1) that their official successors, Manuel Martinez and Aristedes Zavaras, be substituted in their place as chief of police and manager of safety, respectively. That motion was granted in part and denied in part. Martinez was added as a Defendant in his official capacity as successor to MacFarlane who was dismissed as a party. Zavaras was added as a Defendant in his official capacity as successor to Coogan. Coogan remains as a Defendant in his individual capacity. The rest of the supervisory officials are each sued in an official capacity only.

tiff fails to state a claim against the City in her ninth and tenth claims for relief under 42 U.S.C. §§ 1983 and 1985; (3) Defendants have immunity from the state torts; (4) This court should decline to exercise jurisdiction over the pendent state tort claims. I grant the motion in part and deny it in part.

### I. *Factual Allegations.*

Plaintiff asserts the pertinent facts established through the investigative record, depositions and other discovery as well as her affidavit are as follows.[2] On the night of July 24, 1984 she had been drinking alcohol and was driving her car on the streets of Denver. Before she was stopped, she had consumed a six-pack of beer and, approximately one half-hour earlier, a bottle of Irish Cream liqueur.

At approximately 11:45 p.m., Officer Harry Queen, acting as a police officer of the City and County of Denver stopped her because her car was weaving. In investigating whether she was driving under the influence of alcohol, Queen performed roadside sobriety tests upon Plaintiff when Defendant Officer James H. "Buster" Snider arrived at the scene. After some discussion between Queen and Snider, they determined not to arrest her. Queen advised Plaintiff not to drive her car and left her with Snider.

Snider told Plaintiff he would follow her home to make sure she would arrive there safely and they proceeded. At a dark and secluded industrial area, Snider pulled Plaintiff over using the emergency equipment on his police car. By now, in the early hours of July 25, 1984, Snider ordered her into his police car claiming he needed to obtain additional information.

Snider then began touching Plaintiff against her will on her breasts, buttocks and vaginal area and forcibly removed her underwear. He then drove a short distance to a more secluded area and had sexual intercourse with Plaintiff against her will. Snider had placed his revolver on the floorboard of the police car. Throughout this time Plaintiff pleaded with him not to commit these

acts upon her and to allow her to return to her car so she could continue on her way home.

Snider then drove Plaintiff in his police car through the streets of Denver, making her lie down in the front seat. As he was driving, he continued to have sexual contact with her by placing his hands and fingers inside her vagina.

Snider took Plaintiff inside a White Spot restaurant and ate his dinner. Thereafter, he took her to the Denver Police Department Traffic Operations and en route continued to make her lie down in the front seat of the police car, again having forcible sexual contact with her. At Traffic Operations, Snider made Plaintiff slide out of the police car and into his private car. Thereafter, after turning in his log book to complete his shift of duty, Snider returned to his car where he resumed his sexual contact with Plaintiff by placing his hand and fingers inside her vagina.

At this time Queen came up to Snider's car, witnessed the sexual acts of Snider and told Plaintiff, "Baby, can I fuck you too?" Plaintiff asked Queen if he had a family and what they would think if they saw him sexually assaulting her. Snider told Queen there was no need for him to come along and drove off continuing his forcible sexual contact.

Snider again drove to a secluded area and again forcibly had sexual intercourse with Plaintiff. Thereafter, he forced her to masturbate him. Plaintiff was crying and pleading with Snider to take her to her car so she could go home. Snider eventually took Plaintiff back to her car after he made her promise not to reveal to anyone what had occurred. He told her he knew where she lived and she should never say anything about what he had done to her or about the actions of Queen.

Later that day, Plaintiff went to the Denver Police Department to notify them about the assaults committed by Snider. She went to Denver General Hospital to be examined

---

**2.** These facts are not necessarily undisputed. However, for the purposes of this summary judgment motion, I "construe the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Blue Circle Cement, Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1503 (10th Cir. 1994).

by a physician and to obtain a rape kit. There, Denver police officers intervened and ordered that no rape kit should be given to her. She was not examined by a doctor.

Faced with the unwillingness of Denver Police Department to investigate her complaints, Plaintiff conducted her own investigation to determine the identities of Snider and Queen. She found the police station where she had been required to move from the police car to Snider's personal car. There, amongst several police officers, she recognized Snider as the officer who had raped and sexually assaulted her. After determining Snider's identity, she reported this to the Denver Police Department. Once the Department informed Snider and Queen of the complaints, Snider called Plaintiff and threatened her.

When confronted with these allegations by members of the Police Internal Investigations and Inspection Bureau, Snider denied having sexual contact with Plaintiff while on duty in the police car. Faced with a polygraph examination he told the polygraph examiner he had not told the truth and gave a different account of what had occurred. Thereafter, Snider, in a supplemental statement, admitted to having sexual relations with Plaintiff but denied he had done so forcibly while on duty and denied she had ridden in his police car.

When Snider was confronted with the investigative reports, indicating he had been seen with Plaintiff at the White Spot Restaurant, while on duty, he admitted she was in his police car, but denied having sexual contact with her in it. Snider and Queen then both took and failed polygraph examinations. As a result of Plaintiff's complaint, Queen received four days suspension without pay and Snider was dismissed from the police force.

The Denver Police Department had a history of numerous complaints alleging Snider's activities with regard to improper sexual contact with females, using his authority as a police officer. In 1980, Snider was investigated for raping an intoxicated woman whom he had volunteered to give a ride home from a bar, when he and another officer were in the bar in police uniform. The woman complained several months later to the Denver Police Department that Snider had raped her, forced her to commit oral sex on and masturbate him while he placed his revolver on the floorboard of the car and had taken her to the White Spot Restaurant. Snider in his initial statement denied sexual relations with the woman. After being confronted with a polygraph investigation showing he had lied, Snider admitted he had sex with the woman in the parking lot of the White Spot Restaurant, but claimed she had forced him to do it. After investigation, the Denver Police Department determined Snider had not raped the woman. No criminal charges were filed against him. Although the woman's polygraph examination revealed she was truthful about her account of the incident, the allegations were found to be not proven and Snider was not disciplined for the rape charge. He was disciplined only for lying to his superiors and for improper conduct while not on duty and in uniform. He was given a five day suspension without pay and was allowed to work off the fine by working five days that would normally be his days off.

Following this incident, in the fall of 1983 through spring of 1984, Snider was investigated for multiple violations of having an unauthorized female in his police car, for having an improper relationship with a thirteen-year-old Hispanic runaway and known prostitute and for having his girlfriend ride with him in his police car. As a result of the investigation concerning the thirteen-year-old girl, Lt. Leary of the Denver Police Department stated the conduct of Snider "can only be described as despicable" and that if the information regarding his contact with her was to become public, "the discredit to the Denver Police Department would be devastating." Snider was given no discipline in relation to his contact with the thirteen-year-old girl.

In the course of that investigation, the Staff Inspection Bureau learned Snider was making advances to other young Hispanic girls in West Denver. In another arrest, Snider was alleged to have a black female prostitute in his automobile while making other arrests. Officers who worked with Snider said he would frequently pick up fe-

males who came in contact with him during his work as a police officer; they would ride around with him in the police car without authorization while he conducted other police work and Snider frequently transferred them to his own car at the end of his shift.

At the time of the incident involving Plaintiff, Snider's immediate supervisor, Sergeant McMillan, was aware of Snider having females in his police car and discussing with other officers his having sexual relations with them when he got off work. Snider's account of these various allegations vacillates from denial to explaining that there were a lot of girls in the West Denver Projects that wanted to hug him and could not keep their hands off him. Officer Lamb, a partner of Snider during part of this time, described Snider's mode of picking up females that he came into contact with while on duty, having them ride with him during his tour of duty, and transferring them to his own car when he finished his shift.

Snider received no discipline for any of these allegations from the fall of 1983 to the spring of 1984. He was disciplined in the spring of 1984 for having his so called "girlfriend" ride around with him and his partner in his police car while conducting police business. Though recommended that Snider be given a thirty day suspension without pay, the Chief of Police, Thomas Coogan, fined Snider eight days loss of pay and allowed him to work eight days that would normally have been his days off, to avoid suffering any financial loss.

With regard to Queen, Plaintiff's counsel requested the investigative records and reports concerning various incidents of disciplinary action, but at the time of filing the opposition to the motion for summary judgment, had received only the Departmental Order of Disciplinary Action. This reveals Queen was suspended from duty without pay effective December 16, 1982 for an indefinite period of time as a result of being charged with Second Degree Assault, a Class 4 felo-

ny, and Official Oppression, a Class 2 misdemeanor; received a sixty day suspension without pay in May 1983 and a seven day suspension without pay in September 1983.

### II. *Claims for Relief.*

The second amended complaint asserts twelve claims for relief. The first, second, third, fifth and sixth claims against Snider and the City (on the basis of *respondeat superior*)[3] state tort claims of sexual assault and battery which occurred at five separate places. (Second Am.Compl. ¶¶ 37, 43, 45, 49, 51, 62, 64, 74, 76.) The fourth claim asserts a state tort of assault and battery against Snider for forcible sexual contact with Plaintiff at Traffic Operations, (*id.* ¶ 55); a state tort against Queen for witnessing this act, failing to assist Plaintiff and suggesting he wanted to have sexual intercourse with her, (*id.* ¶ 57); and a vicarious liability claim against the City under *respondeat superior,* (*id.* ¶ 58). The seventh claim asserts a state tort of false imprisonment against Snider from the time he originally stopped her while he was purportedly following her home to the time he released her five to six hours later and against Queen for originally stopping Plaintiff and then leaving her in the custody of Snider, thus assisting Snider in falsely imprisoning her. (*Id.* ¶ 74.) The eighth claim asserts a state tort claim of assault against Snider when, on July 25, 1984 and thereafter, he threatened Plaintiff with further rape, sexual assault and/or battery, (*id.* ¶ 80), and a vicarious liability claim against the City for *respondeat superior,* (*id.* ¶ 82). The ninth claim is asserted under 42 U.S.C. § 1983 against all Defendants[4] for a denial of Plaintiff's rights under the First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendments to the United States Constitution. (*Id.* ¶ 87.) The tenth claim under 42 U.S.C. § 1985 against all Defendants asserts they conspired between themselves through a series of formal and informal policies and decision making channels to deprive Plaintiff of her constitutional rights by allowing Snider to assault women sexually while he was em-

---

3. Unlike the second, third, fifth and sixth claims, the first claim fails to make a specific *respondeat superior* allegation.

4. Although nominally against all Defendants, this claim is directed at the alleged acts of Snider and Queen and the prayer at the end of the claim is directed against "Snider, Queen and the City and County of Denver." (Second Am.Compl. at 16.)

ployed as a police officer. (*Id.* ¶¶ 93–94.) The eleventh claim, against the City for negligent hiring and supervision of Snider and Queen, (*id.* ¶¶ 103–104), and now against Coogan, Zavaras, Martinez and Pena for failing properly to discipline and terminate Snider for previous acts of rape, sexual assault and battery, (*id.* ¶¶ 105–106), and against all these Defendants for failing properly to train Queen to arrest persons driving under the influence and not to leave a female suspect alone with Snider, (*id.* ¶ 109). The twelfth claim asserts against all Defendants the state tort of outrageous conduct, based on Snider's and Queen's aforesaid acts, (*id.* ¶¶ 116, 117), and the remaining Defendants' failure to protect its citizens, despite previous complaints against Snider for raping and sexually assaulting women while acting as a police officer, (*id.* ¶ 118).

III. *Standards for Summary Judgment.*

"Summary judgment is appropriate if 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.'" *Hagelin for President Committee v. Graves,* 25 F.3d 956, 959 (10th Cir.1994) (quoting Rule 56(c)). "In applying this standard, we construe the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Blue Circle Cement, Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1503 (10th Cir.1994).

"'The moving party carries the burden of showing beyond a reasonable doubt that it is entitled to judgment....'" *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993) (quoting *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1437 (10th Cir.1987)). "Rule 56, however, imposes no requirement on the moving party to 'support its motion with affidavits or other similar material *negating* the opponents' claim.'" *John Hancock Mut. Life Ins. Co. v. Weisman,* 27 F.3d 500, 503 (10th Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

"Once the moving party shows it is entitled to summary judgment, the burden shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir.1993) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc,* 912 F.2d 1238, 1241 (10th Cir.1990)). "[T]he nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying on the types of evidentiary materials contemplated by Rule 56." *John Hancock,* 27 F.3d at 503.

"To be a 'genuine' factual dispute, there must be more than a mere scintilla of evidence. To avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative." *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250–51, 106 S.Ct. 2505, 2510, 2511–12, 91 L.Ed.2d 202 (1986)).

"[T]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Bingaman v. Kansas City Power & Light Co.,* 1 F.3d 976, 980 (10th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12).

IV. *Qualified Immunity on Federal Claims.*

■ Defendants Coogan and Queen assert they have qualified immunity from the ninth and tenth claims under 42 U.S.C. §§ 1983 and 1985.[5] Qualified immunity is designed to

---

5. Section 1983 pertinently provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law, suit in equity, or proper proceeding for redress. 42 U.S.C. § 1983.
 Section 1985 pertinently provides:
 (3) If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person ... of the equal protection of the laws, or of equal privileges and

shield public officials from liability and ensure "that erroneous suits do not even go to trial." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir.1993); *Harlow v. Fitzgerald*, 457 U.S. 800, 806–08, 102 S.Ct. 2727, 2732–33, 73 L.Ed.2d 396 (1982); *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir.1988).

Coogan and Queen are sued in their personal or individual capacities, i.e. Plaintiff seeks to impose personal liability on them for actions they took under color of state law. Individual police officers are entitled to qualified or good faith immunity under § 1983 "unless they violate a clearly established constitutional or statutory right of which they knew or should have known at the time of the alleged acts." *Trejo v. Wattles*, 654 F.Supp. 1143, 1146 (D.Colo.1987) (Kane J.)

■ If a defendant pleads qualified immunity, the plaintiff has a two part burden. *Hannula v. City of Lakewood*, 907 F.2d 129, 130–31 (10th Cir.1990). The plaintiff must first show the defendant's actions violated a constitutional or statutory right. *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir.1995). Second, the plaintiff must demonstrate the constitutional or statutory rights allegedly violated by the defendant were clearly established at the time of the conduct in issue. *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020–21, 82 L.Ed.2d 139 (1984). "[P]laintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Romero*, 45 F.3d at 1475. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The precise act in question need not have been held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992).

The defendant is entitled to qualified immunity where the plaintiff fails to carry either part of his two-part burden. *See, e.g., Losavio*, 847 F.2d at 646. If, however, the plaintiff succeeds in carrying his two-part burden, the burden shifts to the defendant. *Romero*, 45 F.3d at 1475. "Once the plaintiff has sufficiently alleged the conduct violated clearly established law, then the defendant bears the burden, as a movant for summary judgment, of showing no material issues of fact remain that would defeat a claim for qualified immunity." *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir.1994); *see also* Fed.R.Civ.P. 56(c). Bearing these principles in mind, I address each of Defendants' arguments.

(a) *Section 1983 claim against Queen.*

Queen argues he is entitled to qualified immunity because Plaintiff has not shown his acts in (1) observing Snider, an off-duty officer, having sexual conduct with her (2) stating that he too wanted intercourse with Plaintiff, violated clearly established law. Queen cites *DeShaney v. Winnebago County Dept. of Social Services*, which held "[a]s a general matter … a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989). In that case, the Court ruled the failure of state social workers, who were aware of dangers to a child, to protect the child from his abusive parents, did not state a claim under 42 U.S.C. § 1983 for denial of liberty without due process of law. The Court reasoned the abuse of the child occurred at the hands of

immunities under the laws … if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against one or more of the conspirators."

private parties and therefore the state did not cause the injuries.

▪ Here, unlike the facts in *DeShaney*, Plaintiff alleges the state, through Queen, took Plaintiff into its custody. She maintains Queen was her initial custodian when he stopped her for suspected driving under the influence and wrongfully left her in the custody and control of another police officer, Snider, knowing that Snider had no legitimate police business with her.

"[T]he police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)); *See United States v. Laboy*, 979 F.2d 795, 798 (10th Cir.1992). Construing the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the summary judgment, Plaintiff reasonably believed she was in police custody when Queen stopped her and when he left her in the custody of Snider.

The Court in *DeShaney* distinguished this type of situation from the facts before it, noting, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199–200, 109 S.Ct. at 1005; *Maldonado v. Josey*, 975 F.2d 727, 730 (10th Cir.1992).

▪ Plaintiff maintains the constitutional right that was violated was the right to the sanctity of her own body, to be free from sexual assaults by a police officer who used his position of authority over her and took advantage of her drunken condition. The Fourth Amendment "guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394,

109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The use of excessive force during an arrest, an investigatory stop, or any other "seizure" of a person at liberty violates that person's Fourth Amendment rights and is actionable under 42 U.S.C. § 1983. *Id.* at 388, 109 S.Ct. at 1867–68; *Butler v. Norman*, 992 F.2d 1053, 1054 (10th Cir.1993).

Plaintiff has come forward with facts and allegations from which a jury could reasonably infer that Queen's actions in stopping her and leaving her in Snider's custody, violated well established law, i.e. his duty to assume some responsibility for her. Accordingly, the burden shifts to Queen to establish "that no material facts that would defeat his claim for qualified immunity remain in dispute." *Id.* Queen fails to address the facts concerning his leaving Plaintiff in Snider's custody and therefore has not carried his burden. Accordingly, Queen is not entitled to summary judgment on the § 1983 claim.

*(b) Section 1983 claim against Coogan.*

▪ Plaintiff's ninth claim is titled "Ninth Claim for Relief against all Defendants under 42 U.S.C. § 1983." (Second Am.Compl. at 15.) Although nominally brought against all Defendants, the § 1983 claim is directed only at the alleged actions of Snider and Queen. (*Id.* ¶¶ 87, 88, 89). The specific allegations under the ninth claim make no reference to Coogan and the prayer at the end of the ninth claim is directed only against "Snider, Queen and the City and County of Denver." (*Id.* at 16.)[6]

Accordingly, since Plaintiff states no claim against Coogan under § 1983, he is entitled to summary judgment on the ninth claim for relief.

### V. *Claim against the City under 42 U.S.C. § 1983.*

The City maintains it is entitled to judgment as a matter of law on the claim against it under 42 U.S.C. § 1983. "The touchstone of a § 1983 action against a governmental body is an allegation that official policy is

---

6. Compare the tenth claim for relief which is directed against all Defendants under 42 U.S.C. § 1985, makes specific allegations that all the individual Defendants conspired to deprive Va-

lanzuela of her rights, and seeks damages against "all the Defendants." (Second Am.Compl. at 18.)

responsible for deprivation of rights protected by the Constitution." *Cannon v. City & County of Denver,* 998 F.2d 867, 877 (10th Cir.1993) (citing *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 680, 98 S.Ct. 2018, 2030–31, 56 L.Ed.2d 611 (1978)). "Municipal liability may not be premised on employment of a tortfeasor with liability imposed under a *respondeat superior* theory." *Id.* "Municipalities can be held liable only when an injury was inflicted by execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.*

> [To] establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged. When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of "deliberate indifference" to the rights of its inhabitants.

*Hinton,* 997 F.2d at 782 (citing *City of Canton v. Harris,* 489 U.S. 378, 385, 389, 109 S.Ct. 1197, 1202–03, 1205, 103 L.Ed.2d 412 (1989)) (citations omitted).

Plaintiff maintains she has made a case for municipal liability because the evidence shows a widespread practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

Defendants argue Snider is merely a "bad apple" for which the city cannot be vicariously liable and analogize the facts to *D.T. v. Independent School District,* 894 F.2d 1176 (10th Cir.1990). There, the court of appeals reversed a jury verdict against a school district arising from a teacher's sexual assault of his students. The assault occurred during the summer vacation when students and teacher were engaged in fund-raising activities for summer basketball camp. Three years earlier, the superintendent had been advised that the then recently hired teacher had allegedly fondled an eleven-year-old boy. Later that year the principal heard two or three rumors regarding the teacher. The plaintiffs claimed the school district's policy of investigating, hiring and supervising the teacher amounted to deliberate indifference to the rights of the students. In reversing the jury verdict, the court of appeals held the acts of molestation practiced by the teacher on the plaintiffs in June 1984, "constituted too remote a consequence of the 1981 hiring and investigation policy to impose liability upon the School District under the civil rights law." *Id.* at 1189.

█ Here, unlike in *D.T.,* the police department's records themselves reflect Snider's continued pattern of improper conduct of having unauthorized women accompany him in his police car, some of whom subsequently accused him of sexual assault. The police department had disciplined Snider for such conduct. The maximum punishment Snider received was eight days suspension without pay which he was allowed to make up to avoid financial loss. He received no corrective training and was allowed to maintain the position he had been so frequently accused of abusing.

The situation is more akin to that described in *Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989). There, the Court held municipal liability under § 1983 attaches where city policy makers elect deliberately to follow a course of action from among alternatives (there, a training program for its police officers) which is so inadequate that the policy makers acted deliberately indifferently to a specific need leading to the violation of constitutional rights. The Court noted "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.*

The evidence produced by Plaintiff does not conclusively prove the existence of a general municipal practice which resulted in her being sexually assaulted. However, when seen in the light most favorable to Plaintiff, the evidence creates a genuine issue of material fact as to whether a policy existed which permitted a known sexual deviant to persist in his misbehavior and resulted in Plaintiff

being deprived of her constitutional rights. Accordingly, the City is not entitled to summary judgment on the § 1983 claim.

## VI. *Conspiracy claim under 42 U.S.C. § 1985(3).*

In her tenth claim for relief against all Defendants under 42 U.S.C. § 1985, Plaintiff alleges Snider, Queen, Coogan, Martinez and Pena conspired among themselves with the intent to deny her her privileges and immunities as guaranteed by the Constitution and § 1983. (Second Am.Compl. ¶ 93). Plaintiff further alleges Coogan, Martinez and Pena conspired

> through a series of formal and informal policies and practices adopted by these Defendants through their official and unofficial decision making channels to deprive the Plaintiff of her rights ... and that as a result of these formal and informal policies and practices, the Defendant Snider was allowed to sexually assault women while employed as a police officer and as a result thereof, the Plaintiff was subjected to rape, sexual assault and battery by the Defendant Snider.

(*Id.* ¶ 94.)

To succeed with a § 1985(3) conspiracy claim, Plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [her] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir.1995).

"A violation of section 1985 must include class-based or racially discriminatory animus." *Bisbee v. Bey,* 39 F.3d 1096, 1102 (10th Cir.1994) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). Defendants maintain Plaintiff makes no allegation and there is no evidence that the alleged conspiracy was motivated by racial animus. Although the allegations in the complaint concerning animus are not clearly spelled out, they could be construed as to include an allegation of class-based discriminatory animus against women.

The Supreme Court has expressly declined to decide whether gender constitutes a "class" encompassed by § 1985(3). *See Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, ——, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993). Other courts have held it does. *See, e.g., Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 224 (6th Cir.1991); *Oltremari v. Kansas Social & Rehab. Serv.,* 871 F.Supp. 1331, 1338 (D.Kan. 1994); *Bedford v. Southeastern Pennsylvania Trans. Auth.,* 867 F.Supp. 288, 294 (E.D.Penn.1994).

■ Since "[s]ex is an immutable characteristic resulting from a fortuity of birth and women historically have been victims of discrimination," *Bedford,* 867 F.Supp. at 294, I agree that women constitute a cognizable class under § 1985(3). Accordingly, Defendants' argument that they are entitled to immunity on the § 1985 claim on the grounds that Plaintiff has failed to allege the necessary racial animus must fail.

" 'The language of [§ 1985(3) ] requiring intent to deprive of equal protection, or equal privilege and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Bray,* —— U.S. at ——, 113 S.Ct. at 759 (quoting *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798). In *Bray,* the Court held the "animus" requirement demands at least a purpose directed specifically at the class. *Id.* The decisionmaker must have selected or reaffirmed a particular course of action at least " 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Id.* —— U.S. at ——–——, 113 S.Ct. at 760–61.

■ Here, there is no evidence that any of the Defendants selected their complained of actions because of the adverse effect they would have on an identifiable group, in this case, women. Accordingly, there is no evidence that Defendants had the discriminatory animus against the class necessary to sustain the conspiracy claim. I therefore grant summary judgment in favor of Defendants on the § 1985 claim.

## VII. *Immunity from State Tort Claims.*

### (a) *City and Defendants sued in their Official Capacities.*

The City and Defendants sued in their official capacity, Zavaras, Martinez and Pena, maintain they have absolute immunity from the state tort claims under the Colorado Governmental Immunity Act, Colo.Rev.Stat. §§ 24–10–101 to 24–10–120 (1988 & 1993 Supp.) ("GIA").

"Except as provided in sections 24–10–104 to 24–10–106, sovereign immunity shall be a bar to any action against a public entity for injury which lies in tort or could lie in tort." § 24–10–108 (1988 & 1993 Supp.) "The GIA establishes sovereign immunity for all public entities and public employees to all actions in tort, or which could lie in ·tort, except as specifically provided under the GIA." *Fogg v. Macaluso,* 892 P.2d 271, 273 (Colo.1995) (en banc).

The City maintains it has absolute immunity under § 24–10–108 because immunity is waived only for those circumstances arising under § 24–10–106, none of which, it argues apply here. Plaintiff asserts the defense of sovereign immunity is waived because the situation involves the operation of a motor vehicle.

The GIA states in relevant part: "Sovereign immunity is waived by a public entity in an action for injuries arising from: "(a) The operation of a motor vehicle, owned or leased by such public entity, by a public ·employee while in the course of his employment. . . ." § 24–10–106(1)(a). Plaintiff alleges the § 24–10–106(1)(a) waiver applies because "[a] police vehicle was used as an intrigical [sic] part of the sexual assault of the Plaintiff. The Plaintiff not only was transported in the Police vehicle, but was sexually assaulted repeatedly in the police vehicle." (Memo Law Opp.Mot.Summ.J. at 30–31.)

■ Defendants argue the waiver does not apply because Plaintiff's injuries did not arise from the operation of the police vehicle, but rather from the conduct of Snider which took place in the vehicle. I agree. This conclusion is bolstered by the legislative history of § 24–10–106(1)(a) contained in the Legislative Council Report to the Colorado General Assembly, Governmental Liability in Colorado, Research . Publication No. 134 (1968). The section concerning waiver of immunity for the operation of a motor vehicle states, "[t]he committee agree that, with respect to injuries arising from automobile accidents caused by the negligent operation of government-owned vehicles, the defense of sovereign immunity should not be available to a public entity." *Id.* at 136. The paragraph discussing the waiver of immunity for government owned motor vehicles is captioned "automobile accidents." *Id.* at xii. *See Fogg,* 892 P.2d at 273.

■ The apparent intent of the General Assembly was to waive the defense of sovereign immunity for injuries arising out of automobile accidents caused through the negligent operation of government-owned vehicles. This is not the case here. Accordingly, the City is entitled to absolute immunity on the state tort claims against it.

Such conclusion is consistent with the Colorado Supreme Court's determination that the waiver of sovereign immunity for "a dangerous condition of a public building" under § 24–10–106(c) must stem from "a physical or structural defect in the [public] building" rather than from an activity conducted within the building. *Jenks v. Sullivan,* 826 P.2d 825, 830 (Colo.1992). Although *Jenks* was partly overruled by *Bertrand v. Board of County Commissioners,* 872 P.2d 223 (Colo. 1994), the *Jenks* construction of the statutory building exception· was left untouched. Applying the reasoning in *Jenks* to the § 23–10–106(a), the waiver of immunity for injuries arising out of the operation of a motor vehicle would not extend to injuries arising out of activity conducted within the vehicle.

■ The suit·against the Defendants acting in their official capacities, Zavaras, Martinez and Pena, is the same as the suit against the City itself. "Official capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . an official-capacity suit is in all respects, other than name, to be treated as a suit against the entity.'" *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d

**1422**

114 (1985) (citing *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36). Accordingly, Zavaras, Martinez and Pena are entitled to the same sovereign immunity as the City from the state torts. *See Fogg*, 892 P.2d at 273 ("the GIA establishes sovereign immunity for all public entities and public employees....")

With respect to the twelfth claim for outrageous conduct, the GIA provides a further basis for granting summary judgment to the City and those sued in their official capacity. The act pertinently provides: "A public entity shall not be liable either directly or by indemnification for punitive damages or for damages for outrageous conduct...." Colo. Rev.Stat. § 24–10–114(1), (4) (1988).

█ Accordingly, I grant summary judgment in favor of the City and against Plaintiff on the first, second, third, fourth, fifth, sixth, seventh, eighth, eleventh and twelfth claims. I also grant summary judgment against Plaintiff and in favor of Zavaras, Martinez and Pena on the eleventh and twelfth claims.

(b) *Individual Defendants.*

The individual Defendants, Queen and Coogan, maintain they have qualified immunity developed under common law from the state torts. In *Cooper v. Hollis*, 42 Colo. App. 505, 600 P.2d 109, 111 (1979), the court discussed the extent of immunity available to a police officer under common law. The court distinguished between a discretionary act, which is automatically afforded public official immunity, and a non-discretionary act, where "the court must apply a second test, that of balancing the consideration of harm to the individual citizen against the policy of promoting effective government." *Id.*

"[A]n official performing discretionary acts within the scope of his office enjoys only qualified immunity. He is shielded from liability for civil damages only insofar as his conduct is not willful, malicious or intended to cause harm." *Trimble v. City & County of Denver*, 697 P.2d 716, 729 (Colo.1985) (en banc). "As regards the issue of official immunity, the concept of discretionary acts has a specialized and limited meaning. In this

limited sense, discretionary acts are those which are of a judgmental, planning, or policy nature." *Cooper*, 600 P.2d at 111. "Nondiscretionary acts, on the other hand, are those that involve performance of a mandatory duty at the operational level." *Id.*

Queen maintains the allegations against him concern discretionary acts. He relies on the decisions in *Leake v. Cain*, 720 P.2d 152, 163 (Colo.1986) and *Whitcomb v. City & County of Denver*, 731 P.2d 749, 752 (Colo. App.1986) which held respectively that the decisions whether to take an intoxicated person into protective custody and whether to take a motorist stranded at a motel to a gas station are discretionary. The allegations against Queen, however, go beyond these acts.

█ Plaintiff's allegations are that Queen left her in the custody and control of Snider in a drunken condition, did not assist or otherwise preventing the Defendant Snider from committing sexual acts upon her which the Defendant Queen witnessed and assaulted her by threatening to commit sexual acts upon her. Construing the evidence favorably towards Plaintiff, these acts of Queen would be outside the scope of his authority. "An official has no immunity for actions outside his authority." *Trimble* 697 P.2d at 729. Thus, Queen is not entitled to qualified immunity on the basis that his acts giving rise to the complaint were discretionary.

█ Coogan, on the other hand is entitled to qualified immunity in that the acts giving rise to the allegations against him were "of a judgmental, planning, or policy nature." *See Cooper*, 600 P.2d at 111. Plaintiff's allegations against Coogan concern his failure to protect the citizens of Denver, despite previous complaints against the Defendant Snider for raping and sexually assaulting women while acting as a police officer. The acts giving rise to the complaint against Coogan are his failure properly to hire, train, supervise or discipline his officers. None of these allegations concern the "performance of a mandatory duty at the operational level." *Id.* Rather, they are discretionary acts of a judgmental or policy nature. As such, Coogan is entitled to qualified immunity because there is no evidence to show that his conduct

was "willful, malicious or intended to cause harm." *Trimble,* 697 P.2d at 729. Accordingly Coogan is entitled to summary judgment on the state tort claims.

#### (i) *Seventh Claim for False Imprisonment.*

Queen maintains he has qualified immunity against the seventh claim because that claim alleges he falsely imprisoned Plaintiff when he originally stopped her upon suspicion of DUI. Defendants maintain the claim is frivolous because the complaint itself alleges Plaintiff "had been drinking alcohol and was driving her automobile." (Second Am. Compl. ¶ 10.) Accordingly, Defendants assert Queen had probable cause to stop Plaintiff.

 Plaintiff, however, does not base her allegation of false imprisonment against Queen on the fact that he originally stopped her. Defendants ignore Plaintiffs' allegations that Queen not only stopped Plaintiff, but left her in the care and custody of Snider. (*Id.* ¶ 74.) One may be liable for false imprisonment though his or her conduct, for example as an instigator, was only an indirect cause of the false imprisonment. Restatement (Second) of Torts § 45A (1965). Disputed issues of material fact remain for trial as to whether Queen's conduct constituted false imprisonment.

#### (ii) *Twelfth Claim for Outrageous Conduct.*

Queen claims he has qualified immunity from Plaintiff's claim for outrageous conduct. In Colorado, to prevail on a claim for outrageous conduct, a plaintiff must show that the defendant, "by extreme and outrageous conduct, intentionally or recklessly caused him or her severe emotional distress. Outrageous conduct is that which is so outrageous and extreme as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Corcoran v. Sanner,* 854 P.2d 1376, 1381 (Colo.App.1993).

To withstand the Defendants' motion for summary judgment, Plaintiff has the burden to show that a triable issue of fact exists. *See Culpepper v. Pearl Street Building, Inc.,* 877 P.2d 877, 883 (Colo.1994) (en banc). "A triable issue of fact would exist if there were evidence that the defendants engaged in outrageous conduct with the specific intent of causing severe emotional distress or that the defendants acted recklessly with the knowledge that there was a substantial probability that their conduct would cause severe emotional distress." *Id.* "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Id.*

 Plaintiff maintains Queen's actions in leaving her in her drunken condition with Snider and in failing to aid or assist her or otherwise prevent Snider from committing sexual acts upon her which Queen witnessed and further assaulting her by threatening to commit sexual acts upon her constitute extreme and outrageous conduct. (Second Am. Compl. ¶ 117.)

Construing the factual record and reasonable inferences therefrom in the light most favorable to Plaintiff, I find reasonable persons could differ as to whether Queen's alleged conduct was extreme and outrageous and therefore believe this claim against him is for the jury. Accordingly, I deny Queen summary judgment on the twelfth claim for outrageous conduct.

### VIII. *Pendent Jurisdiction.*

Defendants ask in the alternative that I decline to exercise jurisdiction over the pendent state tort claims. "[A] federal court may exercise jurisdiction over a state law claim when a related federal claim is of sufficient substance to support federal jurisdiction." *Miller v. Glanz,* 948 F.2d 1562, 1567 (10th Cir.1991) (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)).[7]

---

7. In 1990, Congress enacted 28 U.S.C. § 1367, which governs the area of pendent claim jurisdiction and refers to such jurisdiction as "supplemental jurisdiction." That section, however, applies only to civil actions commenced on or after December 1, 1990. Because this action was commenced in 1985, before the effective date, I

"The state and federal claims must derive from a common nucleus of operative fact." *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138.

 Here, the remaining 42 U.S.C. § 1983 federal claim is substantial and arises from the same nucleus of operative facts as the pendent state law claims. Defendants chose to remove this case to federal court. Considerations of judicial economy, convenience and fairness to the litigants will be served by the exercise of pendent jurisdiction. *See Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138. Further delay in this case is completely unacceptable. I will exercise pendent jurisdiction over the state law claims.

### IX. *Conclusion.*

For the aforesaid reasons:

(1) With regard to the ninth claim for relief under 42 U.S.C. § 1983, I GRANT Defendants' summary judgment motion with respect to Coogan, but DENY the motion with respect to Queen and the City and County of Denver, Zavaras, Martinez and Pena.

(2) With regard to the tenth claim for relief under 42 U.S.C. § 1985, I GRANT Defendants' summary judgment motion with respect to Queen, Coogan, the City and County of Denver, Zavaras, Martinez and Pena.

(3) With regard to the first, second, third, fifth, sixth and eighth law claims for relief under state law, I GRANT Defendants' summary judgment motion with respect to the City and County of Denver;

(4) With regard to the fourth and seventh claims for relief under state law, I GRANT Defendants' summary judgment motion with respect to the City, but deny the motion with respect to Queen;

(5) With regard to the eleventh claim for relief under state law, I GRANT Defendants' summary judgment motion with respect to the City, Zavaras, Martinez, Pena and Coogan;

(6) With regard to the twelfth claim for relief under state law, I GRANT Defendants' summary judgment motion with respect to

the City, Zavaras, Martinez, Pena and Coogan, but DENY the motion with respect to Queen;

(7) I DENY Defendants' summary judgment motion insofar as it requests me to decline to exercise jurisdiction over the pendent state law claims.

apply the law in effect before § 1367, as set out in *United Mine Workers v. Gibbs.*