192 F.Supp.2d 1094 (2001)
Angela SANDERS, Personal Representative of William David Sanders, Deceased, Plaintiff,
v.
THE BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF JEFFERSON, COLORADO, the Sheriff's Department of the County of Jefferson, Colorado, Sheriff John C. Stone, Individually and in his Official Capacity, Terry Manwaring, Individually, John Kiekbusch, Individually, David Walcher, Individually, John Dunaway, Individually, John Does (Nos.1-10), Jane Does (Nos.1-10), Defendants.
No. CIV.00-B-791.
United States District Court, D. Colorado.
November 27, 2001.
*1095 *1096 *1097 *1098 *1099 A. Bruce Jones, Holland & Hart, LLP, Denver, CO, for Angela Sanders.
J. Andrew Nathan, Andrew J. Fisher, Bernard Roland Woessner, Nathan, Bremer, Dumm & Myers, PC, Denver, CO, Charles L. Casteel, Jeffrey Ralph Pilkington, Daniela Gonzales, Davis, Graham & Stubbs LLP, Denver, CO, William A. Tuthill, III, Lily Wallman Oeffler, County Attorney's Office, Golden, CO, Alan Kaminsky, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for Jefferson County, Bd. of County Com'rs, Jefferson County Sheriff's Dept., John C. Stone.
*1100 J. Andrew Nathan, Andrew J. Fisher, Bernard Roland Woessner, Nathan, Bremer, Dumm & Myers, PC, Denver, CO, Charles L. Casteel, Daniela Gonzales, Davis, Graham & Stubbs LLP, Denver, CO, William A. Tuthill, III, Lily Wallman Oeffler, County Attorney's Office, Golden, CO, Alan Kaminsky, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for John C. Stone, John Kiekbusch, David Walcher, John Dunaway, John Does (Nos. 1-10), Jane Does (Nos. 1-10).
J. Andrew Nathan, Andrew J. Fisher, Bernard Roland Woessner, Nathan, Bremer, Dumm & Myers, PC, Denver, CO, Charles L. Casteel, Jeffrey Ralph Pilkington, William A. Tuthill, III, Lily Wallman Oeffler, County Attorney's Office, Golden, CO, Alan Kaminsky, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for Terry Manwaring.

MEMORANDUM OPINION AND ORDER
BABCOCK, Chief Judge.
Defendants The Board of County Commissioners of the County of Jefferson, Colorado (the Board), The Sheriff's Department of the County of Jefferson, Colorado (Sheriff's Department), Sheriff John C. Stone (Sheriff Stone), Terry Manwaring, (Lt. Manwaring), John Kiekbusch (Lt. Kiekbusch), David Walcher, (Lt. Walcher), John Dunaway, (Undersheriff Dunaway), John Does (Nos. 1-10), and Jane Does (Nos. 1-10) move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss all claims brought by Plaintiff Angela Sanders, Personal Representative of William David Sanders (Mr. Sanders or Dave Sanders), a teacher killed in the April 20, 1999 attack on Columbine High School. After consideration of the motion, briefs, arguments of counsel, and for the following reasons, I deny it.

I.

Facts
The unspeakable events at Columbine High School on April 20, 1999 are unprecedented. Plaintiff alleges that at approximately 11:17 a.m. on April 20, 1999, Columbine High School students Eric Harris and Dylan Klebold walked from an adjacent parking lot toward Columbine High School's southwest entrance doors. Complaint (C/O) ¶ 27. Each carried a shotgun, one, a Savage model 67H pump; the other, a Savage model 31 ID double-barrel, and various home-made explosive devices. Id. Harris also carried a 10-shot Hi-Point model 995 carbine rifle, while Klebold carried an Intratec TEC DC-9 semi-automatic pistol. Id. As the two neared the school at about 11:21 a.m., Harris and Klebold began shooting students outside, killing two and wounding approximately seven others. Id. at ¶ 28.
After being notified of the shots, the Columbine High School resource officer, a Jefferson County sheriff's deputy, drove his vehicle onto the grass within 30-40 yards of the southwest entrance doors, where he and another arriving Jefferson County sheriff's deputy exchanged shots with Harris and/or Klebold, who were positioned on the walkway leading to those doors. As the deputies took cover, Harris and Klebold walked through the doors and into the school building. Id. at ¶ 29.
Upon entering the school building, Harris and/or Klebold shot a student and a teacher then proceeded down a long hallway toward the administrative area near the front entrance of the school, shooting and throwing small home-made explosives as they walked. Several minutes later, the two reversed course and headed toward the cafeteria or "commons" area adjacent to the southwest doors through which they had entered. Id. at ¶¶ 30-31.
*1101 Meanwhile, the first 911 calls from witnesses at the scene were received in the Littleton Combined Communications Center about 11:21 a.m. and were immediately routed to the Jefferson County Sheriff's Department. The emergency-rescue response to the scene was massive and swift, consisting of several fire trucks, 48 rescue and ambulance vehicles, 2 rescue helicopters, and approximately 166 emergency medical and fire rescue personnel. See C/O ¶ 42.
Some or all of the Command Defendants, designated by Plaintiff as Sheriff Stone, Lt. Kiekbusch, Lt. Walcher, Lt. Manwaring, and Undersheriff Dunaway arrived at Columbine High School between 11:30 and 11:45 a.m. and took command and control of the scene on behalf of the Jefferson County Sheriff's Department. C/O ¶ 33.
Lt. Kiekbusch, at the direction of and/or with the approval and knowing acquiescence of Sheriff Stone, assumed the roll of "Police Operations Officer" in command and control of all SWAT, police, bomb squad, emergency medical (EMS) and fire rescue personnel, equipment and resources at the scene when he arrived at Columbine High School about 11:30 a.m. He continued in that role throughout the afternoon of April 20, 1999. C/O ¶ 35.
Undersheriff Dunaway, at the direction of and/or with the approval and knowing acquiescence of Sheriff Stone, assumed and exercised command and control of SWAT, police, bomb squad, EMS and fire rescue personnel, equipment and resources when he arrived at Columbine High School. C/O ¶ 36.
Lt. Manwaring, at the direction of and/or with the approval and knowing acquiescence of Sheriff Stone and Lt. Kiekbusch, assumed the operational next-in command role of "Incident Commander" when he arrived at Columbine High School. C/O ¶ 37.
Lt. Walcher, a Jeffco Sheriff's Department SWAT Team supervisor, at the direction of and/or with the approval and knowing acquiescence of Sheriff Stone, Lt. Kiekbusch, and Lt. Manwaring, replaced Lt. Manwaring as Incident Commander when Lt. Manwaring left the staging area to approach the School with a SWAT team about 1:002:00 p.m. on April 20, 1999. C/O ¶ 38.
The Command Defendants directed all responding police, including SWAT teams, fire, and rescue personnel, to report to and remain within the "staging area," where most of these resources remained unutilized until much later in the afternoon. C/O ¶¶ 40, 42.
At about 11:35 a.m., Mr. Sanders, who was standing outside the cafeteria crowded with students on the early-lunch shift, saw the gunmen approaching, ran into the cafeteria shouting for all students to evacuate the cafeteria immediately. Id. at ¶ 66. Ignoring his own safety, Mr. Sanders remained behind the last of the students fleeing the cafeteria to guide them to safety through a stairway. As he urged the last of the students up the stairs, Mr. Sanders was shot twice in the back by Klebold with the Intratec DC-9 at approximately 11:40 a.m. Id. at ¶¶ 2, 67.
Despite his wounds, Mr. Sanders continued to guide the students as he staggered up the stairs and into the upstairs hallway. Mr. Sanders and approximately fifty other students and teachers made their way to Science Room 3, Columbine High School's outermost classroom on the second floor in the building's southwestern corner. Once in Science Room 3, Mr. Sanders collapsed from his wounds. Another teacher, Doug Friesen, and several students began administering first aid by pressing makeshift compresses into his wounds to slow the bleeding. C/O ¶¶ 2, 4, 68.
*1102 By no later than approximately 12:15 p.m., Harris and Klebold, known to the Command Defendants to be the only shooters in the school, committed suicide in the Library. C/O ¶¶ 5-6. The Command Defendants learned of the suicides no later than 12:30 p.m., C/O ¶¶ 6, 64, as their deaths were visible to police sharp-shooters posted on nearby rooftops using high-powered binoculars and telescopic rifles. Those officers were in direct communication with the Command Defendants by telephone and/or portable radio. See C/O ¶ 64.
Despite this information, and in contradiction to the Jefferson County Sheriff's Department Manual, the Command Defendants, initially and for the rest of the afternoon, characterized the situation as a "hostage" situation rather than a "high risk" situation. C/O ¶¶ 11-12, 44-45, 52, 57. As a result of this erroneous characterization, the equipment, resources, and personnel available to the Command Defendants were not deployed until hours after the attack began.
In the meantime, by no later than 12:30 p.m., at least two of Mr. Sander's Science Room 3 companions informed the police via 911 calls, relayed to the Command Defendants, of the seriousness of Mr. Sanders' condition as well as his precise location. Id. at ¶¶ 69-70. To remove any possibility of confusion as to Mr. Sanders' location, a fellow teacher placed a large white sign in the exterior window, on which was written in large capital letters the following message: "1 BLEEDING TO DEATH." C/O ¶ 72.
Throughout the afternoon, another teacher in Science Room 3 remained on the phone with the 911 operators delivering updates, relayed to the Command Defendants, on Dave Sanders' worsening medical condition. Id. at ¶ 70. In response to the initial and later 911 calls from Science Room 3, beginning around 12:00 noon and continuing for more than three hours, based on the Command Defendants orders, the 911 operators: 1) informed the callers that help was "on the way" and would arrive "in about ten minutes," or words to that effect; 2) continued to provide such assurances; and 3) ordered all Science Room 3 occupants not to leave the room under any circumstances to seek aid or rescue for Mr. Sanders. Id. at ¶¶ 77-78.
As a direct result of these assurances of imminent aid, the students and teachers in Science Room 3 initially chose to forego private efforts to rescue or obtain aid for Mr. Sanders. Id. at ¶ 79. As hours passed with no sign of rescue or forthcoming aid, Mr. Sanders' companions no longer believed the assurances of the Command Defendants. Thus, they informed the Command Defendants of their intent to break the exterior windows to get help for Mr. Sanders themselves. Id. at ¶ 108. The Command Defendants squelched this plan by threatening the Science Room 3 occupants with the prospect that breaking the windows would draw the attackers to their location, even though the Command Defendants had known since approximately 12:30 p.m. that Harris and Klebold had taken their own lives. See id. at ¶¶ 64, 109.
Some time after that, the Command Defendants directed the Science Room 3 occupants to tie a red handkerchief to the exterior door handle in the hallway for the express purpose of marking and calling attention to the room, purportedly to flag the room for the SWAT teams. Id. at ¶ 110. Recognizing the inconsistency of this order, and, unlike the Command Defendants, unaware that their assailants no longer posed any danger, the Science Room 3 occupants expressed concern to each other that the red handkerchief *1103 would draw the shooters to their location. Id. at ¶ 111.
In the meantime, in apparent disregard of the Command Defendants orders to the contrary, a radio-equipped Denver SWAT team entered the school building. Id. at ¶ 145. Despite maintaining radio communication with this SWAT team, id. at ¶¶ 96, 103, and possessing reliable, corroborated information as to Dave Sanders' exact location and condition, id. at ¶¶ 69-74, the Command Defendants withheld this information from the SWAT team. At the same time, these Defendants continued to reassure the Science Room 3 occupants that help was on its way and would arrive shortly. Id. at ¶¶ 77-79.
As time passed, Mr. Sanders' condition continued to deteriorate, and help did not come, one of the other teachers left Science Room 3 some time between 2:30 and 3:00 p.m. in search of medical aid for Dave Sanders. C/O ¶ 112. As this teacher attempted to leave the school building through a door, he encountered a SWAT team member, who, acting under the command and control of the Command Defendants, prevented him from leaving the building by shoving him back inside. Id. Furthermore, as a result of the Command Defendants actions, this teacher was forcibly prevented from leading any other rescue or emergency medical personnel to Dave Sanders or giving directions to Science Room 3. See id. at ¶ 112.
Despite the Command Defendants' knowledge of Dave Sanders' deteriorating medical condition and exact location and, by no later than 12:30 p.m., that Harris and Klebold lay dead in the Library, these Defendants:
1) foreclosed the use of available fire trucks, ladders, and breaching equipment to achieve direct entry through Science Room 3's exterior southwest windows to rescue him;
2) prohibited paramedics and other emergency medical personnel from going to his aid; and
3) barred the SWAT units from attempting a surgical entry into Science Room 3 from the roof, or through one of the exterior doors beneath it.
Id. at ¶ 8.
As a result of the Command Defendants' decisions and orders, Science Room 3 was the last area in Columbine High School reached by SWAT teams conducting room-by-room sweeps on April 20, 1999. Id. at ¶ 9. Thus, Dave Sanders was the last wounded person reached by police or rescue personnel despite being the only individual known to the Command Defendants to be in urgent need of emergency life-saving medical treatment whose life could have been saved.
When a SWAT team finally entered Science Room 3 at approximately 4:00 p.m., they announced, "we are here for the living and the walking." Id. at ¶ 114. Pursuant to the Command Defendants' directives, the SWAT team required everyone, including the students administering pressure to Dave Sanders' wounds, to leave the room before the SWAT team would move him. Id. at ¶¶ 113-15. By 4:00 p.m., Dave Sanders' heretofore survivable wounds had become fatal and he died. Id. at ¶¶ 1, 10.

II.

Claims
Ms. Sanders brings the following claims based on the foregoing allegations:
Claim One
Deprivation of right to life, liberty, and personal security under 42 U.S.C. § 1983State Created Danger  against Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John/Jane Does in their individual capacities

*1104 Claim Two

Deprivation of right to life, liberty, and personal security under 42 U.S.C. § 1983Special Relationshipagainst Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John/Jane Does in their individual capacities
Claim Three
Deprivation of right to life, liberty, and personal security under 42 U.S.C. § 1983Failure to Remedy Subordinates'/Colleagues' Deprivations of Constitutional Rightsagainst Defendants Stone, Kiekbusch, Manwaring, Dunaway, Walcher, and John/Jane Does in their individual capacities
Claim Four
Municipal Liability under 42 U.S.C. § 1983 arising from Acts of Policymaker Sheriff Stone in his Official Capacity - Deliberate Indifference of Policymaker to Deprivation of Civil Rightsagainst Defendants The Board of County Commissioners of the County of Jefferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado
Claim Five
Municipal Liability under 42 U.S.C. § 1983 arising from Acts of Policymaker Sheriff Stone in his Official Capacity - Policymaker's Failure to Prevent Witnessed Constitutional Deprivations-against Defendants The Board of County Commissioners of the County of Jefferson, Colorado, and The Sheriff's Department of the County of Jefferson, Colorado
Ms. Sanders contends that the Defendants' actions and orders on April 20, 1999 foreclosed every possibility of her father receiving the lifesaving emergency care he required, thus depriving her father of his substantive due process rights to life, liberty, and personal security guaranteed by the Fourteenth Amendment of the United States Constitution. Therefore, according to Plaintiff, based on their orders, the Command Defendants were under a categorical constitutional obligation to protect Mr. Sanders.
In opposition, Defendants move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all claims for failure to state claims upon which relief may be granted because DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249(1989) and its progeny preclude Plaintiff's claims. Further, the Command Defendants, sued in their individual capacities, accepting as true Plaintiff's well pleaded facts, assert entitlement to qualified immunity from suit.

III.

Fed.R.Civ.P. 12(b)(6)
Under Rule 12(b)(6), I may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pleaded facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. Id. I accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party." See Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304 (10th Cir.1998). All reasonable inferences must be construed in the plaintiff's favor. See Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir.1998). Id.

IV.

Qualified Immunity
The Command Defendants maintain they are entitled to qualified immunity from the first, second, and third claims under 42 U.S.C. § 1983 because the contours *1105 of the pertinent law were not clearly established on April 20, 1999.
The basic principles of qualified immunity are well settled. The purpose of a qualified immunity defense under § 1983 is to limit the deleterious effects that the risks of civil liability would otherwise have on government operations at all levels, federal, state, and local. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Discretionary decisions by government actors inevitably impact the lives of private individuals, sometimes with harmful effects. Moreover, such decisions are inescapably imperfect. Especially in the context of police work, decisions must be made in an atmosphere of great uncertainty. Holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement. See Tangwall v. Stuckey, 135 F.3d 510, 520 (7th Cir.1998); Torchinsky v. Siwinski, 942 F.2d 257, 260 (4th Cir. 1991). Qualified immunity thus allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
Qualified immunity under § 1983 shields officials from civil liability unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The linchpin of qualified immunity is objective reasonableness. Anderson, 483 U.S. at 639, 107 S.Ct. 3034. So long as the officer's actions, viewed from the perspective of the officer at the time, can be seen within the range of reasonableness, then no liability will attach. See id.
Important to this reasonableness inquiry is whether the rights alleged to have been violated were clearly established at the time of the challenged actions. Harlow, 457 U.S. at 818, 102 S.Ct. 2727. If the law supporting the allegedly violated rights was not clearly established, then immunity must lie. Anderson, 483 U.S. at 640, 107 S.Ct. 3034. Where the law is clearly established, and where no reasonable officer could believe he was acting in accordance with it, qualified immunity will not attach. Id. The purpose of this doctrine is to ensure that police officers and other government actors have notice of the extent of constitutional restrictions on their behavior. Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).
In a § 1983 suit for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. See Saucier v. Katz, 533 U.S. 194, 198-202, 121 S.Ct. 2151, 2155-56, 150 L.Ed.2d 272 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. As a result, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).
In Siegert v. Gilley, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court clarified the appropriate framework for reviewing qualified *1106 immunity from § 1983 substantive due process claims. Under Siegert, I must first determine whether Plaintiff "has asserted a violation of a constitutional right at all." See id. at 232, 111 S.Ct. 1789. If Plaintiff has asserted the violation of a constitutional right, then I determine whether that right was clearly established so that reasonable officials in Defendants' situation would have understood their conduct violated that right. See Liebson v. New Mexico Corrections Dept., 73 F.3d 274, 276 (10th Cir.1996); Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir.1994).
Following the Siegert framework, I must first decide whether Ms. Sanders has properly asserted the violation of constitutional rights in Claims One, Two, and Three.

V.

Substantive Due Process 42 U.S.C. § 1983 Jurisprudence

A. Fourteenth AmendmentDue Process Clause
The Fourteenth Amendment to the United States Constitution explicitly guarantees to each citizen that no state shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const., amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment guarantees the right of appropriate procedural process, not implicated in this case, before a state can act to deprive an individual of his or her life, liberty, or property. The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against "certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

B. 42 U.S.C. § 1983
The vehicle through which a violation of substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution is remedied is 42 U.S.C. § 1983:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.
This section, enacted in its original form in 1871, was specifically designed to provide a method for redress of violations of the rights protected under the Fourteenth Amendment by state actors. As described by the United States Supreme Court, § 1983 developed in the following manner:
As a result of the new structure of law that emerged in the post-Civil War eraand especially of the Fourteenth Amendment, which was its center-piece the role of the Federal Government as guarantor of basic federal rights against state power was clearly established.... Section 1983 opened the Federal Courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.
* * * * * *
The very purpose of § 1983 was to interpose the Federal Courts between the states and the people, as guardians of the people's federal rightsto protect the people from unconstitutional action under color of state law, "whether that *1107 action be executive, legislative, or judicial."
Mitchum v. Foster, 407 U.S. 225, 238-40, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).
While implemented to provide a method of redress for the deprivation of life, liberty or property by state action, neither § 1983 nor the Fourteenth Amendment transform mere tortious acts into constitutional violations. Daniels, 474 U.S. at 332, 106 S.Ct. 662. Instead, the Fourteenth Amendment protects citizens from the arbitrary, abusive, or oppressive use of governmental power. Id. This basic principle of due process jurisprudence dictates that the Fourteenth Amendment does not confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

C. DeShaney Decision
In DeShaney, the Supreme Court announced the now firmly entrenched rule that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect individuals from private violence. See id. at 195-97, 109 S.Ct. 998. In DeShaney, the Winnebago County Department of Social Services (the County) received numerous reports that Joshua, a small child, was being abused by his father. Id. at 192-93, 109 S.Ct. 998. Joshua, temporarily removed from his father's custody, was soon returned to his father's care. Id. The County continued to receive reports that Joshua was being abused but failed to act. Id. Eventually, Joshua's father beat him so severely that he suffered permanent brain damage. Id. Joshua and his mother sued the County and several of its employees, alleging that the County had violated the Substantive Due Process Clause of the Fourteenth Amendment by failing to intervene on his behalf and protect him from his father's abuse. Id.
The DeShaney Court rejected plaintiffs' argument that the County acquired an affirmative obligation to protect Joshua from his father's abuse based on the fact that the County was aware of the alleged abuse. Id. at 195, 109 S.Ct. 998. Relying on the premise that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protects them from each other," the Court held that:
[N]othing in the ... Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Consistent with these principles, ... the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual.
Id. at 195-96, 109 S.Ct. 998. The principle that there is no constitutional right to police protection is derived from well settled jurisprudence addressing the purposes of the Fourteenth Amendment and 42 U.S.C. § 1983, the statutory provision providing a remedy for violations of the Constitution.
The Tenth Circuit has gleaned two exceptions to DeShaney's general rule that a state is not constitutionally obligated to protect individuals against private *1108 violence: 1) the special-relationship doctrine, and 2) the state-created or enhanced danger doctrine. See Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir.1995), cert. denied, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996).

1. Special Relationship Doctrine
The special-relationship doctrine stems directly from DeShaney itself, and applies in situations where the state imposes limitations upon an individual's freedom to act on his or her own behalf:
[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalfthrough incarceration, institutionalization, or other similar restraint of personal libertywhich is the `deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
DeShaney, 489 U.S. at 200, 109 S.Ct. 998 (emphasis added); see also City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (duty to provide medical care to injured suspects in police custody); Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (duty to protect involuntarily committed mental patients from harm by themselves and others).
In the years following DeShaney, courts have struggled with the question of what restraint "similar" to incarceration or institutionalization is sufficient to give rise to a state's duty to protect. The Tenth Circuit has held that a plaintiff must show involuntary restraint by a government official in order to establish a duty to protect under the special relationship theory. See Liebson, 73 F.3d at 276. (librarian who was sexually assaulted while employed in a prison failed to show existence of special relationship because employment was voluntary).
In Graham v. Independent Sch. Dist. No. I-89, 22 F.3d 991, 994-95 (10th Cir.1994), the Tenth Circuit held that schools have no duty under the Due Process Clause to protect students from assaults by other students, even when the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will the state assumes some measure of a constitutionally mandated duty of protection. Id. at 994. Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school. Id., citing Maldonado v. Josey, 975 F.2d 727, 732 (10th Cir.1992), cert. denied, 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993). Inaction by the state in the face of a known danger is not enough to trigger a constitutional duty to protect unless the state has a custodial or other "special relationship" with the victim. See Graham, 22 F.3d at 995. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament ... but from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney, 489 U.S. at 200, 109 S.Ct. 998; Seamons v. Snow, 84 F.3d 1226, 1235-36 (10th Cir.1996), rev'd in part on other grounds, 206 F.3d 1021 (10th Cir. 2000). Moreover, a defendant's knowledge of the risk of harm is not relevant to the determination of whether a special relationship existed. See Graham, 22 F.3d at 994 ("foreseeability cannot create an affirmative duty to protect" under the special relationship doctrine "when plaintiff remains unable to allege a custodial relationship"). Indeed, inaction by the state in the face of a known danger will not trigger the constitutional duty to protect. Id. at 995 citing Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir.), cert. denied, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).

*1109 2. State-Created or Enhanced Danger Doctrine
In its reasoning, the DeShaney Court also planted the seed for the second exception to the general rule that the state has no duty to protect citizens from private violence known as the state-created or enhanced danger doctrine:
While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.

DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (emphasis added).
Courts have also grappled with the question of what state conduct "creates or enhances" danger sufficient to establish a duty to protect. In Medina v. City and County of Denver, 960 F.2d 1493 (10th Cir.1992), the Tenth Circuit explained that police officers who engaged in a high speed car chase that resulted in injuries to a bicyclist could be liable for creating a special danger faced by the bicyclist. Id. at 1495-99.
The Tenth Circuit also addressed directly the state-created or enhanced danger doctrine in Graham, 22 F.3d 991, concerning acts of violence at two schools. At one school, a student was shot and killed by another student. At the other school, a student was stabbed by a fellow student. The students' parents brought separate § 1983 actions against their respective School Districts which were consolidated on appeal.
The Graham Court noted that "DeShaney ... le[ft] the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger," citing Reed, 986 F.2d at 1125 and Dwares v. City of New York, 985 F.2d 94, 99 (2nd Cir.1993). Citing L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992), cert. denied, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), the Court stated that "[this state-created danger] doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." See also Graham at 995. Based in part on the plaintiffs' failure to point to any affirmative actions by defendants that created or increased the danger to the victims, the Court affirmed the district court's dismissal of the plaintiffs' complaints.
The contours of this doctrine were further explored in Uhlrig, 64 F.3d 567, in which the husband of a therapist killed by a mental hospital patient filed a § 1983 action asserting that the state's decision to terminate a special unit created the danger that led to his wife's death. The Uhlrig Court articulated a five-part test to determine whether a defendant created or enhanced the danger for the plaintiff: 1) whether plaintiff was a member of a limited and specifically definable group; 2) whether defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) whether the risk to plaintiff was obvious or known; 4) whether defendant acted recklessly in conscious disregard of that risk; and 5) if such conduct, when viewed in total, "shocks the conscience" of federal judges. Id.
To bring the Uhlrig test in line with DeShaney, the Tenth Circuit later held in Armijo v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir.1998) that "in addition to meeting Uhlrig's five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased ... the danger in some way." Id. at 1263; accord Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1238 (10th Cir.1999) (noting that danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger").
*1110 I address Plaintiff's claims in light of these controlling legal principles.

VI.

Claims Analysis

A. Claim One § 1983 ClaimIndividual Command Defendants State-Created Danger

In moving to dismiss Claim One, the Command Defendants contend that Plaintiff fails to allege circumstances or conduct meeting the second, fourth, and fifth elements of the Uhlrig test. See Reply Brief, p. 6. Because the Command Defendants raise no objection to the first and third prongs of the Uhlrig test, I assume, for purposes of this Rule 12(b)(6) motion, that the Command Defendants concede that Mr. Sanders was a member of a limited and specifically definable group and that the risk of harm to him was obvious or known to the Defendants.

1. Uhlrig Test-Second Element
According to the Command Defendants, it was Harris' and Klebold's conduct rather than their own that put Dave Sanders at risk of the serious, immediate and proximate harm of bleeding to death. See Reply Brief, p. 6. Defendants' reliance on Harris' and Klebold's actions, while understandable, misstates the proper focus under the circumstances alleged in Plaintiff's complaint.
Plaintiff alleges that although Mr. Sanders sustained "life-threatening" gunshot wounds at the hands of Klebold, these injuries "remained survivable with treatment for three hours (or longer) after he had been shot...." See C/O ¶¶ 3, 10. More specifically, Plaintiff alleges that:
[t]he bullets that struck Dave Sanders tore partially through the left carotid artery in his neck, and the right subclavian vein in his back. As serious as the wounds to these blood vessels plainly were, there are collateral routes of blood supply for the parts of the body served by each of them. Sanders' wounds were thus survivable if first-aid pressure were applied to impede bleeding and prevent shock, and then followed up with medical treatment and transfusion reasonably soon thereafter (i.e., within hours).

C/O ¶ 75. (emphasis supplied).
As framed by Plaintiff's complaint, then, the danger created by the Command Defendants was that because of the Command Defendants' affirmative actions, Dave Sanders' survivable wounds would prove fatal as a result of the more than three hour delay in providing rescue or medical assistance. Focusing on the risk to Dave Sanders as defined by Plaintiff, I turn to the pertinent cases concerning state-created or enhanced danger in assessing the second element of Uhlrig.
In Armijo and Sutton, the Tenth Circuit set the requirement that, here, Plaintiff must allege that the Command Defendants affirmatively placed Dave Sanders in the path of substantial risk of serious, immediate and proximate harm.
In Armijo, the parents brought suit against a school and several individually named school employees when, after being suspended and driven home without parental notification, their son Philadelphio committed suicide. Plaintiffs' son, a special education student, repeatedly had expressed suicidal thoughts and at least one of the individual defendants knew that Philadelphio had access to firearms at his home. The suicide was immediately preceded by the decision of the principal, Mary Schutz, and school counselor, Tom Herrera, to suspend Philadelphio. Contrary to stated school policy, without contacting Philadelphio's parents, and despite his known suicidal ideation and access to firearms, Ms. Schutz directed Mr. Herrera to remove Philadelphio from the school *1111 grounds and drive him home, even though they both knew Philadelphio's parents were not home. Philadelphio shot himself at home after Mr. Herrera dropped him off and before his parents returned home. See Armijo, 159 F.3d at 1256-57.
In affirming denial of summary judgment as to two defendants, the Armijo court emphasized that the defendants must have actually placed the Plaintiff in harms way, stating that:
[t]he key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third-party's [acts] to occur.

Armijo, 159 F.3d at 1263. (emphasis added).
Furthermore, according to Armijo, "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." Armijo, 159 F.3d at 1263. Here, according to the Command Defendants, because Mr. Sanders was already shot and at risk of bleeding to death as they arrived at Columbine High School, regardless of how they intervened to coordinate the law enforcement response, the Command Defendants did not create a danger, because it already existed when Harris and Klebold shot Dave Sanders.
In Sutton, the victim, James Sutton, who suffered from severe cerebral palsy, mental retardation, total blindness and the inability to speak, communicated to his mother that he was being inappropriately touched by another boy at school. James' mother complained to the school, which took no action other than to promise to constantly supervise James in the bathroom. On an occasion when James was using the bathroom, a teacher's aide abandoned her monitoring post to answer a telephone. When she returned, she found James being molested by another student. See Sutton, 173 F.3d at 1230-31.
In affirming dismissal of the complaint against the defendant teacher, the Court stated that "Moore [the teacher] himself did not personally, affirmatively place James in any danger." Sutton, 173 F.3d at 1239. The Court then compared Moore's actions to the teacher aide's actions, who was not a named defendant, stating that it was the teacher's aide who "affirmatively placed James in danger by leaving him to answer the phone," thus, rendering James vulnerable to the attack. Id.
The Command Defendants rely on language in Armijo and Sutton indicating that for the danger creation theory to be viable in this case, they must have actually placed Dave Sanders in harm's way creating the opportunity that would not otherwise have existed for third-parties Harris and Klebold, to attack the school and shoot Dave Sanders or, in some other way, they increased his vulnerability to being shot, which placed him in danger of bleeding to death.
The Command Defendants ignore two salient points distinguishing the "third-party" acts aspect of Armijo and Sutton from this case. First, pursuant to Plaintiff's allegations, the initial danger that Mr. Sanders would bleed to death created when Klebold shot him in the hallway was obviated by the first-aid measures administered by the students and teachers in Science Room 3. Thus, Sanders wounds *1112 were survivable, if properly treated, for several hours thereafter. See C/O ¶¶ 68, 75, Second, the Armijo case did not involve a third-party actor in any sense at all. In Armijo, the person who inflicted the harm and the victim were one and the same. In contrast, here, the Command Defendants' affirmative actions created the danger, distinct, albeit related to the gunshot wounds, that delaying medical treatment would render Dave Sander's survivable wounds fatal.
In Sutton, the Court dismissed Plaintiff's "danger creation" claim because the named defendant did not personally affirmatively act to create or enhance the danger to the victim. See id. at 1239. In sharp contrast, the Command Defendants are alleged to have issued multiple orders refusing to permit any access to or rescue of Dave Sanders. See e.g., C/O ¶¶ 88, 93, 109, 112, 123. Indeed, these affirmative acts included physical restraint of one of the Science Room 3 teachers who attempted to leave the school to get help for Mr. Sanders. See C/O ¶ 112.
Under these circumstances, Plaintiff's allegations can be construed fairly to meet the second element of the Uhlrig test that the Command Defendants' affirmative actions on April 20, 1999 put Mr. Sanders at risk of the "serious, immediate and proximate harm" that his survivable wounds would prove fatal if the Command Defendants delayed/prevented rescue or medical treatment.

2. Uhlrig Test-Fourth Element
The Command Defendants contend that they did not act recklessly in conscious disregard of the risk of Mr. Sanders bleeding to death. In support of their position, the Defendants point to their efforts to secure the Columbine High School premises, establish a "command post" and "staging area," coordinate SWAT team approaches to Columbine High School, position sharpshooter teams, establish police or SWAT units with vantage points surrounding the school, deploy two separate SWAT teams into the high school through two separate entrances to the building, coordinate an effort to obtain search warrants and search Harris' and Klebold's homes, maintain communication with individuals trapped inside the high school, and direct that a red handkerchief be tied to the exterior door handle of Science Room 3. I am not persuaded.
These actions cited by the Command Defendants are not those that form the basis of Plaintiff's "danger-creation" claim. Indeed, these actions standing alone may not have been reckless and may not have contributed to the delay in medical treatment reaching Dave Sanders. Rather, Plaintiff's claim is based on myriad allegations concerning the Command Defendants' actions in affirmatively blocking access to or rescue of Dave Sanders between 12:30 p.m. and 4:00 p.m., notwithstanding his deteriorating medical condition and readily-accessibly location, see e.g. C/O ¶¶ 88, 93, 109, 112, 123, and their knowledge, by 12:30 p.m., that Harris and Klebold had committed suicide in the Library. See C/O ¶¶ 6, 64. Based on these circumstances, I conclude that Plaintiff's allegations are sufficient to show that the Command Defendants acted recklessly in conscious disregard of the risk that Dave Sanders' survivable wounds would prove fatal if they affirmatively delayed/prevented rescue or medical help from reaching him.

3. Uhlrig TestFifth Element
The fifth Uhlrig element requires that a defendant's conduct, when viewed in total, must be "conscience shocking." To "shock the conscience," a plaintiff must do more than show that the government acted intentionally or recklessly *1113 caused injury to a plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of out-rageousness and a magnitude of potential or actual harm that is truly conscience shocking. Id. at 574. The Uhlrig Court acknowledged, however, that the level of culpability that must be shown under the "shocks the conscience" standard is difficult to define. In an effort to guide the analysis of whether particular conduct "shocks the conscience," the Tenth Circuit emphasized the importance of three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: 1) the need for restraint in defining their scope; Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); 2) the concern that § 1983 not replace state tort law; DeShaney 489 U.S. at 202, 109 S.Ct. 998; and 3) the need for deference to local policymaking bodies in making decisions impacting upon public safety. Collins, 503 U.S. at 128-29, 112 S.Ct. 1061; see also Uhlrig, 64 F.3d at 573.
In County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), a case in which the parents of a motorcycle passenger killed during a high speed police chase brought a § 1983 action, the Supreme Court shed light on the Uhlrig principles. Lewis can be read to translate the Uhlrig principles into a sound framework, grounded in common sense, for analyzing those myriad situations involving law enforcement and governmental workers deployed in emergency situations. The Court reiterated the important principle that rejects "the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct" and held "that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." See Lewis, 523 U.S. at 848-49, 118 S.Ct. 1708. The Court then observed that conscience-shocking behavior is most likely to be found "at the other end of the culpability spectrum"that is, where there is an intent to do harm that is not justified by any government interest. Id. at 849, 118 S.Ct. 1708. The Lewis Court further recognized that in the middle range of the culpability spectrum, where the conduct is more than negligent but less than intentional, there may be some conduct that is egregious enough to state a substantive due process claim. See id. at 849-50, 118 S.Ct. 1708.
Within this middle range, Lewis directs an examination of the circumstances surrounding the conduct at issue and the governmental interests at stake. The Lewis Court then points the inquiry to the official's opportunity for deliberation while drawing helpful analogies to the Eighth Amendment prison context. See id. at 850-55, 118 S.Ct. 1708 citing, inter alia, Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); City of Revere, 463 U.S. 239, 103 S.Ct. 2979; and Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. The marked differences between, for instance, a normal custodial situation in a prison and a violent disturbance in a prison demonstrates "why the deliberate indifference that shocks in the one case is less egregious in the other." Lewis at 852-53, 118 S.Ct. 1708. The "deliberate indifference" standard is only utilized when actual deliberation is practical. Id. In the normal prison context, actual deliberation is not only possible but required in those matters that affect an inmate's general well-being, such as medical care, proper exercise, and adequate nutrition. These are matters about which public officials must make policy decisions with careful attention to their special relationship to those in custodyand about which they have the luxury of prolonged *1114 consideration. Lewis contrasts those deliberative policy judgments with decisions that prison officials must make during a riot. Deliberate indifference does not suffice for constitutional liability under the Eighth Amendment "when a prisoner's claim arises not from normal custody but from response to a violent disturbance." Id.
The Court looked to the level of culpability required for an Eighth Amendment violation in the prison context to the level required for substantive due process liability, instructing that the analysis rests upon:
the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed."
Id. at 853-54, 118 S.Ct. 1708 quoting Daniels v. Williams, 474 U.S. at 332, 106 S.Ct. 662. Lewis specifically analogized a prison official's response in a riot situation to a police officer's conduct in a high speed chase. Both situations require the officer's instant judgment and, accordingly, no substantive due process claim can lie unless the defendant official's conduct was unjustified by any government interest and was "tainted by an improper or malicious motive." Id. at 855, 118 S.Ct. 1708.
Therefore, in assessing the constitutionality of law enforcement actions, I must distinguish between emergency action and actions taken after opportunity for reflection. Appropriately, I must give great deference to the decisions that necessarily occur in emergency situations. With that caveat in mind, I look to the nature of the official conduct on the spectrum of culpability that has tort liability at one end; conduct in which the state actor intended to cause harm and in which the state lacks any justifiable interest on the other. In emergency situations, only conduct that reaches that far point will shock the conscience and result in constitutional liability. Where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience. See also Radecki v. Barela, 146 F.3d 1227 (10th Cir.1998), cert. denied, 525 U.S. 1103, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999) (sheriff's deputy's had no time for deliberation in making instantaneous judgment call in suddenly explosive law enforcement situation; therefore no § 1983 claim based on substantive due process violation).
The result here comes clear when focused through the lens of the Lewis standard. From the time when the attack on Columbine High School began on April 20, 1999 at approximately 11:15 a.m. until approximately 12:30 p.m. when the hostile gunfire ceased and the Command Defendants knew that Harris and Klebold were dead, the competing interests of public and officer safety outweighed the rescue needs of the students and staff inside Columbine High School, including Dave Sanders. This first hour and fifteen minutes of the attack is closely analogous to the prison riot discussed in Lewis during which state officials were forced to make "split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." See Lewis, 523 U.S. at 853, 118 S.Ct. 1708. Under such circumstances, unless an intent to harm a victim is alleged, there is no liability under the Fourteenth Amendment *1115 redressible by an action under § 1983. See id.
In this case, the pertinent time frame falls between approximately 12:30 p.m. when the Command Defendants learned that Harris and Klebold were dead and 4:00 p.m. when a SWAT team finally reached Dave Sanders in Science Room 3. Pursuant to Plaintiff's allegations, during that time, the Command Defendants knew Dave Sanders' exact location and the nature of his wounds. Yet they took repeated affirmative actions to block access to or rescue of Dave Sanders by private citizens or other state actors not withstanding his readily-accessible location.
Under the factual allegations of Plaintiff's complaint I cannot say precisely at what moment between 12:30 p.m. and 4:00 p.m., the circumstances facing the Command Defendants changed. I do conclude that at some point during the afternoon, the Command Defendants gained the time to reflect and deliberate on their decisions. At that point, the Command Defendants demonstrated a deliberate indifference towards Dave Sanders' plight shocking to the conscience of this federal court.

4. Defendants' Opposition
Defendants attempt to undermine Plaintiff's state-created or enhanced danger claim by comparing this case to Bryson v. City of Edmond, 905 F.2d 1386 (10th Cir. 1990) and Salas v. Carpenter, 980 F.2d 299 (5th Cir.1992). Bryson and Salas are distinguishable on their facts.
In Bryson, several postal workers were injured or killed after they were shot by a co-worker inside the post office where they worked. The city police arrived at the scene within minutes of the outset of the shooting. After accurately classifying the incident as a hostage situation, the police chief ordered his officers not to enter the post office or make any attempt to rescue the hostages despite having SWAT teams on scene and knowledge of a safe route into the post office. See Bryson, 905 F.2d at 1388. The Tenth Circuit affirmed the district court's dismissal of the Bryson plaintiffs' § 1983 substantive due process claim brought pursuant to the Fourteenth Amendment, although on slightly different grounds.
After the trial court dismissed plaintiffs' claims, the Supreme Court issued DeShaney. Using the DeShaney reasoning, the Tenth Circuit affirmed the district court's dismissal of the § 1983 claim because:
... limitations on the victims' liberty were imposed by their assailant, [], not by the police. The fact that the police surrounded the post office when summoned to the scene did not create a special situation in which affirmative duties of protection arose. A contrary rule would impose constitutional duties on the police whenever they respond to reports of violence and assemble at the scene, not just in "certain limited circumstances" and "with respect to particular individuals" as taught by DeShaney. Id. at 197, 109 S.Ct. 998.
Bryson, 905 F.2d at 1393.
At first glance, the circumstances at Columbine High School appear similar to those in Bryson. Upon closer examination, however, as to Dave Sanders the differences are marked. In Bryson, the police had no basis for distinguishing among the victims as individuals, created no risk or enhanced the risk for any particular victim, and took no action with regard to any such individual. See id. at 1392-93. ("The Court said affirmative duties of care and protection arise under the Constitution only `with respect to particular individuals'. ...") quoting DeShaney, 489 U.S. at 197, 109 S.Ct. 998. The Bryson Court reasoned that disregarding DeShaney's "particular individual" requirement would effectively "impose constitutional duties on *1116 the police whenever they respond to reports of violence and assemble at the scene." Id. at 1393.
Plaintiff alleges that the Command Defendants prevented all sources of available aid, private and governmental from either providing Dave Sanders medical aid or rescuing him, despite their knowledge of his identity, his increasingly serious condition, and his precise location. Therefore, Ms. Sanders' Claim One is a specific duty to protect claim rather than a Bryson general duty-to-protect claim.
Next, similar to DeShaney, in which the defendants placed the child "in no worse position than ... had it not acted at all," see id. at 1393, the Bryson defendants did nothing to worsen the plight for the victims inside the post office. Here, however, in sharp contrast, if the Command Defendants "had not acted at all" during the hours after Harris and Klebold died, according to Plaintiff's allegations, Dave Sanders would be alive because the people in Science Room 3 would have rescued him by taking him out of the School or summoning medical assistance themselves. See e.g., C/O ¶¶ 14,79,82.
Defendants rely also on Salas, 980 F.2d 299, a post-DeShaney case. Although a somewhat closer case, Salas is also distinguishable on its facts.
In Salas, Manuel Cabano, the estranged husband of Juanita Hermosillo, a county court clerk, went to the courthouse where he took his wife and a judge hostage. Id. at 302. Although Cabano soon released the judge, he continued to hold his wife hostage throughout the afternoon. When he entered, other persons in the courthouse fled and called the Tarrant County sheriff's department and the Fort Worth police. Both agencies responded including Fort Worth Police Chief Thomas Windham and Tarrant County Sheriff Don Carpenter. Id.
The Fort Worth police dispatched an experienced negotiation team and a SWAT team which positioned snipers with a view of the judge's offices. When Sheriff Carpenter arrived on scene, he demanded that the Fort Worth officers leave, claiming that the courthouse was within the exclusive jurisdiction of the sheriff's department. After a heated exchange, Chief Windham complied. Id. The sheriff's department did not have a SWAT team, lacked a hostage negotiation policy, and did not have deputies with any hostage negotiation experience. Id.
The hostage situation lasted from approximately 3 p.m. to 9:30 p.m. when Cabano shot and killed his wife, then himself. During the ensuing 6½ hours, telephone negotiations were ongoing between Cabano, his attorney, various sheriffs, district attorney investigators, and several unspecified civilians. Meanwhile, a leading hostage negotiation authority offered his services to Sheriff Carpenter, but his offer was refused. Id.
Relying on the state-created or enhanced danger doctrine, the Salas plaintiffs filed, inter alia, a § 1983 claim based on a violation of substantive due process rights. In finding no constitutional violation, the Fifth Circuit reasoned that:
Carpenter did not cut off all avenues of rescue ... without providing an alternative.... Although Carpenter dismissed the Fort Worth police officers, sheriff's deputies were at the same time securing the courthouse and commencing negotiations with Cabano. The fact that sheriff's deputies were ultimately unable to prevent Cabano from killing Hermosillo does not mean that they were not a `meaningful' source of protection for Hermosillo....
Id. at 309.
Here, in contrast, the Command Defendants not only cut off all private avenues of *1117 rescue but also forbade the resources at their command from coming to the aid of Dave Sanders for more than three hours. Furthermore, unlike the actual hostage situation in Salas, based on Plaintiff's complaint, no one in Columbine High School, including the persons in Science Room 3, were ever held hostage by Harris or Klebold.
I conclude Ms. Sanders has properly asserted in Claim One a violation of the Fourteenth Amendment right to substantive due process under the state-created danger doctrine.

B. Claim Two § 1983 ClaimSpecial Relationship Doctrine against Individual Command Defendants
Plaintiff contends that by restraining Mr. Sanders and those with him from leaving Science Room 3 to seek aid or assistance, pursuant to DeShaney, the Command Defendants stood in a "special relationship" with Mr. Sanders giving rise to the constitutional duty to protect and care for him. See id. at 199-200, 109 S.Ct. 998. I agree.
According to Plaintiff, from approximately 11:45 a.m. on, the Command Defendants, through dispatchers, were in telephone contact with the occupants of Science Room 3. C/O ¶ 77. The Command Defendants directed dispatchers to: 1) assure the Science Room 3 callers that help was "on the way" and would arrive "in about ten minutes" (or words to that effect); 2) continue to provide such assurances until directed otherwise; and 3) order all Science Room 3 occupants not to leave Science Room 3 under any circumstances to seek aid or rescue for Mr. Sanders. Id. As a direct result of those assurances, for hours, the students and teachers in Science Room 3 forewent personal efforts to attempt to evacuate Dave Sanders to safety or obtain medical aid for him. Id. at ¶ 79. The Command Defendants knew until at least 3:00 p.m. such assurances were false because they had issued orders affirmatively prohibiting the assembled rescue personnel and SWAT/police officers from entering Columbine High School to rescue Dave Sanders. See C/O ¶¶ 77, 81-82.
As hours passed and Mr. Sanders' condition deteriorated, the Science Room 3 students and teachers informed a police dispatcher by cell phone at about 2:00 p.m. that they were going to throw chairs through the exterior windows to get help for Mr. Sanders. C/O ¶ 108. In response, the Command Defendants, through the dispatcher, threatened that breaking the Science Room 3 windows would draw the attackers attention to their location, despite their knowledge that Harris and Klebold had committed suicide at approximately 12:30 p.m. C/O ¶¶ 6, 109. Once again, the persons in Science Room 3 changed their plans based on the Command Defendants' orders.
In a third attempt to seek aid for Dave Sanders, a teacher left Science Room 3 between 2:30 and 3:00 p.m. but was physically forced back into the school building by a SWAT team member acting under orders of the Command Defendants. See C/O ¶ 112; Transcript, April 27, 2001 Hearing, pp. 105, lines 23-24, 106, lines 14.
Defendants maintain that these allegations do not amount to restraint as contemplated by DeShaney. I disagree. As the DeShaney Court described:
[i]in the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal libertywhich if the "deprivation of liberty" triggering the protections of the Due Process Clause....
*1118 DeShaney, 489 U.S. at 200, 109 S.Ct. 998. (emphasis added). Moreover, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. citing Estelle v. Gamble, 429 U.S. at 103, 97 S.Ct. 285. (emphasis added).
In Armijo, the Tenth Circuit stated that "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a `special relationship' during such restraint to protect that individual from violent acts inflicted by others." Id. at 1261. Plaintiff's Complaint contains a wealth of factual allegations setting forth the Command Defendants' conduct resulting in the prolonged involuntary confinement of Dave Sanders and his companions to Science Room 3 by the Command Defendants. See DeShaney, 489 U.S. at 200, 109 S.Ct. 998.
Plaintiff relies also on the Command Defendants' repeated false promises of aid as an integral, but not essential, part of Claim Two. Defendants are correct that a constitutional duty cannot arise solely from an official's mere awareness of a risk or promises of aid. See DeShaney, 489 U.S. at 200, 109 S.Ct. 998; Pinder v. Johnson, 54 F.3d 1169, 1175 (4th Cir.), cert. denied, 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995). Where, as here, however, Plaintiff brings a substantive due process claim based on a special relationship, I may consider allegations of false promises of aid in support of Claim Two. See Uhlrig, 64 F.3d at 575, n. 15 ("[o]f course, if the state misled a public employee [concerning] his ... working conditions, ... the state could be held liable under § 1983" for resulting injuries); see also L.W. v. Grubbs, 974 F.2d at 120, 123 ("defendant's misrepresentation to plaintiff that she would not work with sex offenders and subsequent placement of plaintiff alone with known violent sex offender contributed toward finding of § 1983 liability.").

1. Command Defendants' Opposition
The cases Defendants cite in an attempt to disavow any special relationship are distinguishable on the issue of custody and control. Once again, Defendants' reliance on Bryson is misplaced. The pivotal distinguishing fact in Bryson is that the police did not impose any restrictions on the plaintiffs' freedom to act on their own behalf. See Bryson, 905 F.2d at 1388. Similarly absent from Salas are any allegations of restraint. Indeed, Defendants' brief quotes language from that case setting it apart from this one: "Hermosillo [the hostage] was not held in state custody or otherwise prevented by the state from caring for herself." Salas, 980 F.2d at 309. (emphasis added). Ms. Sanders has, of course, alleged such a restraint. See C/O ¶¶ 77-78.
Plaintiff alleges that when the Science Room 3 occupants stated their intent to break the Science Room 3 windows, the Command Defendants threatened that breaking the windows would draw the suspects' attention. C/O ¶ 109. The Command Defendants assert in response that Plaintiff fails to allege "any conduct identifying specific individually named Defendants who restrained Mr. Sanders, and fails to assert any statements or conduct directed specifically to Mr. Sanders." See Reply Brief, p. 19, fn. 4.
Claim Two is brought against five named sheriff's defendants, identified as the Command Defendants, based on their command or supervisory directives. C/O ¶ 128. As a result of these command and supervisory directives, it is reasonable to infer that these five Command Defendants exerted custody and control over Dave *1119 Sanders during the afternoon of April 20, 1999.
Every statement made by the Command Defendants through the police dispatchers to the Science Room 3 occupants was made to each person in that room. Indeed, if I were required to select the person in Science Room 3 about whom the Command Defendant possessed the most individual, specific information it would, of course, be Dave Sanders. To say that the Command Defendants' statements and conduct were not directed toward Mr. Sanders is disingenuous.
Based on Plaintiff's complaint, it is reasonable to infer that from approximately 12:30 p.m. to 4:00 p.m., the Command Defendants acted affirmatively to restrain the freedom of the occupants of Science Room 3, including Dave Sanders, to act on their own behalf. Thus, pursuant to DeShaney and Armijo, the Command Defendants entered into a special relationship with Dave Sanders during that time giving rise to a constitutional duty to protect and provide care. Therefore, I conclude Ms. Sanders has properly asserted in Claim Two a violation of the Fourteenth Amendment right to substantive due process under the special relationship doctrine.

C. Claim Three-42 U.S.C. § 1983 -Deprivation of Right to Life, Liberty, and Personal Security-Supervisor Liability-Failure to Remedy Subordinates'/Colleagues' Deprivations of Constitutional Rights-Against Command Defendants in their Individual Capacities
The test for supervisory liability under § 1983 requires "allegations of personal direction or of actual knowledge and acquiescence" in conduct alleged to have violated the constitutional rights of a citizen. See Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir.1992), cert. denied, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Based on my analysis of Claims One and Two, Plaintiff has made an initial showing of an underlying constitutional violation. In addition, Plaintiff's complaint, alleges that the Command Defendants not only had knowledge of and acquiesced in their colleagues and subordinates alleged constitutional violations, but personally participated in this conduct as well. Thus, Plaintiff has set out the essential elements of a supervisory liability claim. See id. at 1400.

D. Claim Four-42 U.S.C. § 1983-Deprivation of Right to Life, Liberty, and Personal Security-Municipal Liability-Arising from Acts of Policymaker Sheriff Stone, in his Official Capacity-Deliberate Indifference of Policymaker to Deprivation of Civil Rights-Against Defendants The Board of County Commissioners of the County of Jefferson, Colorado and the Sheriff's Department of the County of Jefferson, Colorado
Plaintiff alleges that the Municipal Defendants, the Board and the Sheriff's Department are liable under § 1983 for the acts of Sheriff Stone in his official capacity as final policymaker in law enforcement matters for the Board and the Sheriff's Department. She alleges that he personally directed and/or, with actual knowledge acquiesced in, inter alia, the following conduct, which caused or contributed to the claimed constitutional violations:
1. affirmatively blocking all police and rescue personnel from entering Columbine High School until approximately 3 p.m. even though all indications showed with increasing certainty that Harris and Klebold were no longer alive;
2. the decision not to convey Dave Sanders life-threatening medical condition or his precise location in the building to the Denver SWAT team upon its entry into the School;

*1120 3. the officers' repeated false assurances to Science Room 3 occupants for several hours that help would arrive for Dave Sanders "within ten minutes," while at the same time forbidding any rescue personnel from entering the building to go to his aid for several hours; and
4. the officers' orders forbidding any private efforts by Science Room 3 occupants to obtain aid or rescue for Sanders.
See C/O ¶¶ 142-43, 45.
In Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court enunciated the rule for imposing liability on a governmental entity:
a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.
Id. at 695, 98 S.Ct. 2018. The policy need not be formal or written. Id. at 691, 98 S.Ct. 2018. See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
Indeed, a single act of an employee may be imposed on a local governmental entity if the employee possesses final authority to establish policy with respect to the challenged action. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 736-38, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107(1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Ware v. Unified Sch. Dist. No. 492, 902 F.2d 815, 817 (10th Cir.1990). Therefore, local governmental entities such as the Board and the Sheriff's Department may be held liable only for decisions made by officials who have authority under state law to speak as final decisionmakers on the particular issue. See Jett, 491 U.S. at 737, 109 S.Ct. 2702.
Here, the Defendants do not challenge Plaintiff's allegation that Sheriff Stone was a final policymaker in law enforcement matters for Jefferson County, represented by the Board, and for the Sheriff's Department. See C/O ¶¶ 142-43. Rather, they seek dismissal of Claim Four on the grounds that the "Plaintiff's claim fails as a matter of law because the decisions and actions of the Command Defendants [including Sheriff Stone] in attempting a rescue at Columbine High School do not equal a constitutional deprivation itself." Reply Brief, p. 27. To the contrary, I have concluded that Plaintiff has made the requisite predicate showing of an underlying constitutional violation.
Furthermore, Claim Four properly alleges Sheriff Stone's final policymaker status, his conduct underlying the alleged constitutional violations, the injury inflicted, and the requisite intent. See C/O ¶¶ 141-47.

E. Claim Five-42 U.S.C. § 1983 -Deprivation of Right to Life, Liberty, and Personal Security-Municipal Liability-Arising from Acts of Policymaker Sheriff Stone, in his Official Capacity-Policymaker's Failure to Prevent Witnessed Constitutional Deprivations-Against Defendants The Board of County Commissioners of the County of Jefferson, Colorado and the Sheriff's Department of the County of Jefferson, Colorado
Plaintiff alleges that the Municipal Defendants, the Board and the Sheriff's Department *1121 are liable under § 1983 for the following acts of Sheriff Stone in his official capacity as final policymaker in law enforcement matters for the Board and the Sheriff's Department:
1. Sheriff Stone witnessed contemporaneously the actions and orders of his subordinates exerting command and control at the Columbine High School scene during the late morning and throughout the afternoon of April 20, 1999 including their [unconscionable] deliberate indifference to Dave Sanders' known, increasingly desperate [deteriorating] condition and need for medical treatment;
2. Sheriff Stone failed and refused to correct or remedy his subordinates' wrongful disregard of the increasing risk that Dave Sanders would lose his life for lack of the medical aid that Sheriff Stone's subordinates had promised and their own command had foreclosed, communicated a message of approval and acquiesced to his subordinates that may fairly be considered to constitute the approval of Municipal Defendants as a matter of municipal policy.
See C/O ¶¶ 148-53.
Defendants challenge Plaintiff's second municipal liability claim on the same grounds as Claim Four. As I stated, Plaintiff has alleged the requisite predicate showing of an underlying constitutional violation.
In addition, Claim Five alleges Sheriff Stone's final policymaker status, his conduct underlying the alleged constitutional violations, the injury sustained by Mr. Sanders, and the requisite state of mind. See C/O ¶¶ 148-53. Therefore, I deny Defendants' Rule 12 motion to dismiss Claim Five based on the law and reasoning as set out in Section D, supra.

VII.

Analysis of Qualified Immunity
As a matter of law, qualified immunity is not available as a defense to municipal liability. See Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Plaintiff has, however, cleared the initial hurdle of asserting constitutional violations in Claims One, Two, and Three against the Command Defendants, in their individual capacities.
I turn then to the question whether these constitutional rights were clearly established as of April 20, 1999 so that a reasonable police officer in the Command Defendants' position would have understood that his or her actions were in violation of Dave Sanders' rights. See Siegert, 500 U.S. at 232, 111 S.Ct. 1789; Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 516 (10th Cir.1998).
In determining whether the law involved was clearly established, I examine the law as it was at the time of defendants' actions. Hilliard v. City and County of Denver, 930 F.2d 1516, 1518 (10th Cir.), cert. denied, 502 U.S. 1013, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991). "[T]he plaintiff need not show that the specific action at issue has previously been held unlawful," he need only show that the alleged unlawfulness was apparent in light of preexisting law. Id. Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuit courts must have found the law to be as the plaintiff maintains. See Medina, 960 F.2d at 1498; Morfin v. Albuquerque Public Schools, 906 F.2d 1434 (10th Cir.1990).
It is a plaintiff's burden to convince the court that the law was clearly established. In doing so, plaintiff cannot *1122 simply identify a clearly established right in the abstract and allege that a defendant has violated it. Instead, a plaintiff must make a particularized showing that the "contours" of the right are sufficiently clear that a reasonable state actor would understand that what he is doing violates that right. See Patrick v. Miller, 953 F.2d 1240, 1243 (10th Cir.1992) citing Anderson, 483 U.S. at 640, 107 S.Ct. 3034. Although a "precise factual correlation between the then-existing law and the case at-hand is not required," see Patrick, 953 F.2d at 1249, the alleged unlawfulness must be "apparent" in light of preexisting law. Anderson, 483 U.S. at 640, 107 S.Ct. 3034. The question is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted. Id. (emphasis added). If a plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit. Hilliard, 930 F.2d at 1518. Thus, I must examine whether it was clearly established in April 1999 within a sufficiently analogous factual setting that the particular conduct of the Command Defendants was grounds for a § 1983 violation based on the allegations in Claims One, Two, and Three.

A. Claim One § 1983Deprivation of Substantive Due Process Rights State-Created Danger Doctrine Qualified Immunity Defense
Pursuant to the allegations in Claim One, Ms. Sanders must make a particularized showing that the "contours" of the danger-creation jurisprudence were clearly established on April 20, 1999 in the situation confronted by the Command Defendants.
In Armijo, 159 F.3d 1253, the Tenth Circuit confirmed that the "danger-creation" doctrine was clearly established by 1998 at the latest. See also Sutton, 173 F.3d at 1241 (supervisor's individual liability for failure to train and/or failure to implement policy to prevent sexual assaults on severely disabled student was clearly established under danger-creation doctrine; "therefore, the contours of the right ... were clearly established ... and the defense of qualified immunity fails.").
In 1990, the Seventh Circuit held that when a citizen is in danger of dying the police have a duty to not cut off all avenues of lifesaving rescue without providing an alternative. See Ross v. United States, 910 F.2d 1422 (7th Cir.1990). The Ross Court held that a deputy sheriff committed a constitutional tort by ordering qualified bystanders not to rescue a drowning boy while not providing an alternative. Id. at 1432-33. The Court emphasized that the victim's constitutional rights were violated not because the county failed to rescue him, but because the county arbitrarily cut off private avenues of rescue "without providing a meaningful alternative." Id. at 1431.
Moreover, in Kneipp v. Tedder, 95 F.3d 1199 (3rd Cir.1996), the Third Circuit discussed the "state-created" danger doctrine in a case concerning a police officer who abandoned an intoxicated woman outdoors in the middle of a cold winter's night. Mr. and Mrs. Kneipp were walking home from a tavern when Officer Tedder stopped them for creating a disturbance on the highway. Id. at 1201. Shortly thereafter, three other officers arrived on the scene. Concerned about babysitter arrangements for their son, Mr. Kneipp was allowed to leave. When Mr. Kneipp left, Ms. Kneipp was leaning on a police car. Mr. Kneipp testified he assumed that the officers would take his wife to the hospital, the police station, or would at least take care of her because of her inebriated condition. Id. at 1202. Instead, Officer Tedder sent Ms. Kneipp home without assistance. Almost two hours later, Ms. Kneipp was *1123 found unconscious in an embankment across the street from her apartment suffering from hypothermia which resulted in brain damage. Id. at 1203. On these facts, the Third Circuit found that the plaintiff raised a "triable issue of fact as to whether the police officers affirmatively placed [Ms. Kneipp] in a position of danger," id. at 1211, because they cut off [Ms. Kneipp's] private source of protection by giving [her husband] permission to go home alone, thereby increasing the danger that [Ms. Kneipp] would suffer harm in her visibly intoxicated state when they abandoned her. Id. at 1210.
None of these cases, nor, indeed, any other reported cases of which I am aware involve issues of police conduct during a school shooting of the horrific magnitude as Columbine. As the Tenth Circuit teaches, however, "a precise factual correlation" is not required. See Patrick, 953 F.2d at 1249. Of significance, though, is the police involvement in the Kneipp and Ross cases. In both cases, the victim suffered physical harm as a result of the affirmative acts of the police officers.
I conclude that as of April 20, 1999, the "danger-creation" jurisprudence was clearly established in the Tenth Circuit and in sister circuits so that, in light of Plaintiffs' well pleaded allegations, reasonable officers in the Command Defendants' position would have understood that their actions violated Mr. Sanders constitutional right to substantive due process. Thus, at this Rule 12 stage, it is premature to grant qualified immunity to the Command Defendants as to Claim One.

B. Claim Two § 1983Deprivation of Substantive Due Process Rights Special-Relationship Doctrine Qualified Immunity Defense
Concerning Claim Two, Ms. Sanders must also make a particularized showing that the "contours" of the law were sufficiently clear as of April 20, 1999 that the Command Defendants stood in a "special relationship" with Mr. Sanders giving rise to the constitutional duty to provide him care and protection.
Plaintiff relies on three federal district court cases to defeat Defendants' defense of qualified immunity on Claim Two. See T.M. v. Carson, 93 F.Supp.2d 1179 (D.Wyo.2000); Estate of Olivas v. City & County of Denver, 929 F.Supp. 1329 (D.Colo.1996); and Valanzuela v. Snider, 889 F.Supp. 1409 (D.Colo.1995).
Under the doctrine of qualified immunity, for the law to be clearly established, there must be Supreme Court or circuit court authority that has found the law to be as the plaintiff maintains. See Medina, 960 F.2d at 1498; Morfin, 906 F.2d 1434. (emphasis added). Moreover, because cases decided after the date of the conduct at issue here have no bearing on the immunity question. Thus, Carson, decided in 2000, and Olivas, and Valanzuela, both district court cases, offer no support for Plaintiff's position.
Plaintiff proffers one Tenth Circuit decision in the special relationship context. In Yvonne L. v. New Mexico Dept. of Human Servs., 959 F.2d 883, 893 (10th Cir.1992), the Court held that defendant officers were not entitled to qualified immunity in a lawsuit arising from the death of a child in foster care as it was clearly established that "children in custody of the state have a constitutional right to be free from harm." Id. at 893. This holding does not, however, address the circumstances facing the Command Defendants on April 20, 1999 because under Plaintiff's allegations, the Command Defendants did not incarcerate or institutionalize Dave Sanders.
Given the unparalleled and unimaginable events at Columbine, the question is a close one. Again however, the facts need not precisely mirror the facts of a precedent *1124 setting case, Eastwood v. Department of Corrections, 846 F.2d 627, 630 (10th Cir.1988). Under the unique circumstances of the case, the alleged unlawfulness was apparent in light of existing law. I conclude that Uhlrig and Armijo define the contours of the special relationship doctrine in the Tenth Circuit sufficiently so that reasonable officers in the Command Defendants' position would have understood that their actions violated Mr. Sander's constitutional right to substantive due process. Consequently, in light of Plaintiff's well-pleaded allegations, I will deny the Command Defendants qualified immunity as to Claim Two.

C. Claim Three-42 U.S.C. § 1983 -Deprivation of Right to Life, Liberty, and Personal Security-Supervisor Liability-Failure to Remedy Subordinates'/Colleagues' Deprivations of Constitutional Rights-Against Command Defendants in their Individual CapacitiesQualified Immunity Defense
As set out in Section VI C, supra, it has been the law of the Tenth Circuit since 1992 that supervisory liability under § 1983 requires "allegations of personal direction or actual knowledge and acquiescence" in conduct alleged to have violated the constitutional rights of a citizen. See Woodward, 977 F.2d at 1399 (§ 1983 claim against supervising police officers arising out of alleged sexual harassment claim). Because under the circumstances confronted by the Command Defendants the contours of the supervisory liability claim itself and the underlying claims were clearly established as of April 20, 1999, the defense of qualified immunity fails.
Accordingly, IT IS ORDERED that:
1. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim One is DENIED;
2. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Two is DENIED;
3. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Three is DENIED;
4. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Four is DENIED; and
5. Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss Claim Five is DENIED.